## ELLEN DAWSON *et al. vs.* ROBERT BROOME.

### PROVIDENCE—JUNE 19, 1902.

PRESENT : Stiness, C. J., Tillinghast and Rogers, JJ.

(1) *Equity.  Harbor Line.  Filling in Flats.  Riparian Rights.  Injunctions.*

A., owning certain real estate bordering upon Bullock's Cove, the same being tide-water, platted it into numbered lots, and caused the plat to be recorded in the town of Barrington.  In 1894, before the purchase of any of said lots by complainants, A. obtained permission from the harbor commissioners to fill into public tide-water westerly of the lots of the complainants.  In 1898 A. conveyed lots 22, 20, and 19 on said plat to the complainants.  At the time of said purchase the ordinary high-water mark of tide-water was upon all of said lots, which were bounded on the west by the tide-water of said Bullock's Cove.  By said plat other lots were platted below ordinary high-water mark in said cove, and a certain portion of land thirty feet wide, running from north to south westerly of said lots of complainants and partly below high-water mark, was marked on said plat as "Edwin street."  At the time of said purchase complainants were ignorant of the exact location of said lots, which appeared by said plat to be above ordinary high-water mark.  After the purchase of said lots complainants filled in in front thereof on the westerly line of said lots.  Subsequently A. filled in along the westerly line of said lots and along the shore lying westerly of said lots down to a line sixty-six feet westerly of the westerly line of complainants' lots, under a claim of right to all said lands filled in westerly of the westerly line of complainants' lots as indicated on said plat, by virtue of said plat and of the permission given him by the harbor commissioners.  Complainants claimed said land so filled in by virtue of the riparian rights appertaining to their lots bounded by tide-water.  In equity proceedings, to enjoin A. from trespassing upon said land :—

*Held,* that, as complainants' deeds did not in terms bound them on Bullock's Cove nor in any way suggest riparian rights, but referred only to numbered lots on a plat, which were precisely marked as bounded westerly on a proposed street, with another row of lots existing between them and the line up to which A. claimed to own by the plat and the harbor commis-

sioners' assent, complainants' claim must rest, if at all, upon its inclusion within the meaning of the words " with all the privileges and appurtenances thereunto appertaining" in the *habendum* clause.

*Held*, further, that when A. made his plat he had the right, by virtue of the assent of the harbor commissioners as to the territory it applied to, to fill out below high-water mark.

*Held*, further, that A., as riparian proprietor, had the right to make the plat, and to convey to his grantees by deed the lots as platted thereon ; and the limits of the respective lots so conveyed, whether in whole or in part under high-water mark, fixed the bounds of the rights acquired by the purchasers thereof.

*Held*, further, that complainants had no right to fill westerly of the westerly line of the street lying westerly of their lots ; that they had the right to fill the location of said street as a privilege belonging to their lots ; that A. had the right to fill in said street easterly to the westerly line of complainants' lots as platted ; and that, westerly of said street, A. and his grantees of lots westerly of said street were alone entitled to fill out as far as license had been given therefor.

BILL IN EQUITY, seeking a perpetual injunction.    Heard on demurrer to bill, and demurrer sustained.

ROGERS, J.    This is a demurrer to the complainants' bill for a perpetual injunction to prevent the respondent from interfering with certain alleged riparian rights claimed by the complainants to belong to them, and for other relief.

The bill alleges that on ——————— 1874, the respondent, Robert Broome, was the owner of certain real estate in fee simple in the town of Barrington in said State, bordering upon Bullock's Cove, the same being tide-water and a part of Narragansett Bay, where the tide ebbed and flowed ; that thereafter, with a view to the sale of said real estate in lots or parcels, he caused a survey and plat thereof to be made by J. A. Latham, dividing said real estate into divers numbered lots and caused the same to be recorded in the land records of said Barrington ; that on February 14, 1894, and before the purchase of any of said lots by the complainants or by any grantee of the respondent, through whom any complainant holds as hereinafter stated, the said respondent applied to the harbor commissioners of the State of Rhode Island for permission to build out and fill into public tide-water westerly of the lots now of the said complainants, and obtained per-

mission from said harbor commissioners so to build out and fill into the said tide-water as requested by him ; that on May 9, 1898, the complainants, Clarence L. Perry and Frederick D. Perry, and on February 19, 1900, the complainant Ellen H. Dawson became the owners of lots Nos. 22, 20 and 19 on said plat respectively, by purchase from the said respondent ; that on February 16, 1901, the complainant, Lillian S. Bell, became the owner of lots Nos. 17 and 18 on said plat, viz., of No. 17 by purchase from Alba W. Crocker, who on July 9, 1900, purchased the same from one John Weatherhead, who on May 15, 1900, purchased the same from the respondent, and of No. 18, by purchase from said John Weatherhead, who on said July 9, 1900, purchased the same from the respondent ; that at the time of the said purchases by the complainants of said lots, the tide-water in said Bullock's Cove flowed up and upon all of said lots, and the ordinary high-water mark of said tide-water was upon all of said lots, and the said lots were in fact bounded on the west by the tide-water of said Bullock's Cove as indicated by a plat marked "Complainants' Exhibit I" annexed to said bill, and by the high-water line marked thereon ; that at the said respective times of the said purchases of said lots by the complainants and by the said Weatherhead and the said Crocker, they, the said complainants and said Weatherhead and said Crocker, did not know the exact location of said lots or the line of said ordinary high water bordering thereon, but supposed that the first above-mentioned plat, a copy of which marked "Complainants' Exhibit A," was annexed to the bill, was correct and accurate in its location of said lots, and in its location of tide-water, and not until after the purchase of said lots respectively and the delivery of their respective deeds did they discover that the ordinary high-water line of said public tide-water was located in accordance with the line drawn upon the plat marked "Complainants' Exhibit I;" that in and by said plat marked "Complainants' Exhibit A," and in and by said plat marked "Complainants' Exhibit I," it will appear that the said respondent Broome platted divers lots below ordinary high water in said cove, and also that he left a certain portion of said land

thirty feet wide running from north to south, westerly of said lots, and partly below high-water mark, having the appearance of a street or way and marked on said "Complainants' Exhibit A" as Edwin street; that after the purchase of their said lots the complainants, as they claimed they had the right to do, filled in in front of their said lots respectively on the western line of said lots, so-called, with stone, dirt, etc., and were in the habit of keeping boats attached to their said lots by divers appliances for attaching and fastening said boats to said lots, and for the purpose of embarking from their said lots; that thereafterwards, said respondent claiming the right so to do, during the year 1901, and continuously for a long period, to wit,—for two months, entered upon the shore and upon the said tide-water in front of and west of the complainants' said lots and detached their boats fastened to their said lots, and with divers employees, etc., continued to trespass upon complainants' said lots and to fill in with dirt, etc., along the westerly line of all the lots of the complainants, and along the shore lying westerly of the complainants' said lots and down to a line marked "Broome Wall," the same being 66 feet or thereabouts, westerly of the westerly line of the complainants' lots as indicated on said plat marked "Complainants' Exhibit I;" that the respondent ever since the filling in of said lands in tide-water, claimed the right to all said lands filled in as aforesaid westerly of the westerly line of the complainants' lots as indicated on said plat marked "Complainants' Exhibit A," by virtue of said plat and of the permission given to him by the harbor commissioners, and claims all said lands lying westerly of the westerly line of the said complainants' lots filled in into tide-water below ordinary high-water mark to belong to himself in fee simple, and that he has had and still has a right to fill in the same, and ever since filling in as aforesaid, has gone upon said land, &c., and committed trespasses thereon in repairing the same from divers encroachments of the sea thereon and in the occupation thereof, &c., and threatens that unless the complainants purchase at exorbitant prices said lots lying westerly of the lots of the complainants and already filled into tide-water, he

would erect buildings thereon and obstruct their view of the sea and of Narragansett Bay, and their right of access to and from said tide-water.

The complainants claim that at the time of receiving their deeds and at the time of their purchase of said lands respectively they were entitled under the law of this State to all the riparian rights appertaining to said lands as bordering upon and bounded by tide-water including the right of access to and egress from their lots respectively from and to tide-water, and including the right of building and filling out from said lots into tide-water, and that they are now entitled to and are the owners in fee simple of all said land filled in as aforesaid westerly of their said lots, and they pray that the respondent may be perpetually enjoined from further trespassing upon the complainants' said lots, and from further occupation or possession of said land filled into tide-water westerly of and adjoining to the said lots of the complainants, and from building out and filling into tide-water westerly of said lots of the complainants, and from building upon the said made land, and from maintaining or repairing the said wall, etc.

The respondent demurs to the bill and assigns the following as causes of demurrer, viz.:

1.    That there is a misjoinder of parties complainant in said bill.

2.    That the complainants show no common or joint right or title to the relief they seek, but show that whatever right or title they each have or claim is by, through and under several and distinct conveyances of several and distinct lots and under which they hold in severalty and not jointly or in common, and to and under which there are distinct and separate defences.

3.    That the complainants by their said bill show no right, title or interest in or to any of the lands or lots of land or riparian rights lying westerly of the open way or strip, as shown upon the plat referred to in their deeds, lying along and across the westerly fronts of their said lots.

4.    That the plaintiffs have not in and by their said bill made or stated such a case as entitles them, in a court of

equity, to any discovery from this defendant or to any relief against him as to the matters contained in the said bill or any of such matters.

Copies of the several plats and deeds and of the assent of the harbor commissioners referred to in the bill, are attached thereto as exhibits.

(1)   We shall proceed to consider the last two grounds of demurrer first, for if there is a common ground of demurrer fatal to the claims of all these complainants it matters little whether they sue jointly or severally, as the counsel for all the parties being the same and having been heard, they can, without injury to any one, but with equal justice to all, be heard and considered together.

An examination of the deeds given by the respondent to the respective complainants and to those from whom they derive title, shows that they are all substantially uniform, the number of the lots and the names of the grantees being different, of course, to suit the circumstances of the case.   The description of the lots in said deeds are in the following form, viz.: "One certain lot or parcel of land situated in the town of Barrington (near Drownville) Bristol County, R. I., and is laid out and designated as Lot No. — on a replat of a part of the Bayspring Plat, by J. A. Latham, in 1874, a copy of which plat is on record in the town of Barrington aforesaid, and reference to said plat is hereby made." Following the *habendum* clause all the deeds contain full covenants of warranty in the short form.   The deed to said Weatherhead of Nos. 17 and 18 contains this clause, viz.: "It is a condition of this deed that the grantee has the first refusal of lots Nos. 25 and 26 at the current price." Lots Nos. 25 and 26, it may be observed, are directly opposite lots Nos. 17 and 18, respectively, on the cove or water side of the space on the plat designated as Edwin street, and are the very lots to which the complainant Bell claims ownership, without payment, by virtue of the ownership of Nos. 17 and 18.   When said Weatherhead sold No. 17 to said Crocker, and when the latter sold it to the complainant Bell, the refusal clause as to No. 25, was inserted in the respective deeds ; and in the deed

of No. 18 from said Weatherhead to said complainant Bell, the refusal as to both Nos. 25 and 26 was inserted.

All of the complainants' lots as platted are 40 x 80 feet respectively, and front westerly on the platted street designated as Edwin street, and lot No. 22 also bounded on a platted street designated as Park avenue, which extended westerly down to and into the water as far as the plat extended, said lot No. 22 being on the corner of said Edwin street and said Park avenue.

It is also to be observed that the replat by which the complainants bought shows a curving dotted line intended to represent, as we understand, the high-water line, which water line nowhere touches the complainants' lots as platted, or either of them, and touches the platted street designated as Edwin street, but a short distance, and then runs across the row of lots westerly of said street, and which row extends out westerly from said street into the water as far as said plat extends. It is agreed that the replat, or "Complainants' Exhibit A," is the plan referred to in the harbor commissioners' assent to the respondent to fill in the waters of Bullock's Creek opposite certain land then owned by him for straightening the shore on his land.

It is further to be observed that on plat marked "Complainants' Exhibit I" there are two curving water lines represented, the most westerly of which is designated as "Water Line of 1901," which runs up to the westerly side of lot No. 20 for a few feet only and does not touch the lines of either of the other lots designated in the deeds held by the complainants. The easterly water line delineated on said plat is marked "Original water line," and is very curved, and embraces the northwest corner of No. 17 and the southwest corner of No. 22, and the whole west ends of Nos. 18, 19 and 20. We understand that the last-referred to line which is marked "Original water line," is the line of high water referred to in the bill alleged to have been existing when the complainants and their predecessors in title bought their respective lots of the respondent, and which the respondent, for the hearing of this demurrer, admits to have been the fact.

As the deeds to the complainants did not in terms bound them upon Bullock's Cove or Creek, nor by any other words indicating or suggesting water, or riparian or littoral rights, but referred only to certain numbered lots on a plat, which were precisely and distinctly marked as bounded westerly on a proposed street designated as Edwin street, and with another row of lots in addition to said street delineated as existing between them and the line up to which the respondent claimed to own by the plat and the harbor commissioners' assent, the claim of the complainants must rest, so far as it has anything to rest on, upon its inclusion within the meaning of the words, " with all the privileges and appurtenances thereunto appertaining," in the *habendum* clause.

Under the state of facts disclosed are the complainants, or either of them, entitled to discovery or relief?

Gen. Laws R. I. cap. 118, entitled "Of the Protection of Navigation," provides in part as follows ; by section 8 thereof, for the appointment of a board of harbor commissioners, who, by section 9, may mark out harbor lines suitable to be established in any of the public tide-waters of the State where such harbor lines have not already been established, and said section 9 prescribes the proceedings necessary for the establishment of such harbor lines. Sections 10, 11, 12 and 14 are in whole or in part as follows, viz.:

"SEC. 10. The harbor commissioners shall have the general care and supervision of all public harbors and tide-waters within the state, with authority to prosecute for and to cause to be removed all unauthorized obstructions and encroachments therein, and may cause such harbors and public waters to be surveyed and platted and may make such examinations and observations as they may deem necessary to protect and develop the rights and interests of the state in such harbors and public waters ; and may employ such engineers and other service as may be necessary to this end. . . .

"SEC. 11. They shall regulate the depositing of mud, dirt and other substances in the public tide-waters of the state, and shall prescribe the places where the same may be deposited," under a penalty in said section prescribed.

"SEC. 12. All persons who shall build into or over public tide-waters by authority of said commissioners or by authority of the General Assembly any wharf, pier, bridge or other structure, or drive any piles into the land under public tide-water, or fill any flats, shall, before beginning such work, give written notice to the harbor commissioners of the work they intend to do, and submit plans of any proposed wharf or other structure and of the flats to be filled, and of the mode in which the work is to be performed; and no such work shall be commenced until the plan and mode of performing the same shall be approved in writing by a majority of said commissioners; and said commissioners may alter the said plans at their discretion and prescribe the direction, limits and mode of building the wharves or other structures: *Provided*, that nothing herein contained shall be construed to impair the rights of any riparian proprietors to erect wharves authorized to be erected under any of the laws establishing harbor lines within the state, or otherwise by the General Assembly."

. "SEC. 14. Every erection made into or encroachment upon the public tide-waters of the state, not authorized by the General Assembly or by the harbor commissioners, shall be deemed to be a public nuisance and shall be prosecuted as such by the attorney-general."

The effect of the assent given by the harbor commissioners to the respondent to fill out into tide-water has the same effect as the establishment of a harbor line so far as the line to which it applies extends, the only difference being that a harbor line, so-called, is established as to a considerable extent, while an assent, so-called, applies only to a limited extent, and in the case at bar only to the space in front of the respondent's own upland. What, then, is the effect of establishing a harbor line?

In *Engs* v. *Peckham*, 11 R. I. 210, 223, this court, speaking by Durfee, C. J., in 1875, said: "The simple establishment of the line has a meaning of itself, and would still have a meaning, even if the provision in respect to obstructions committed outside the line were totally omitted. The question, then, is, What does it mean? At common law the erec-

tion of a wharf in tide-waters is not indictable as a nuisance unless it obstructs navigation. In this State this doctrine has been liberally applied for the benefit of riparian proprietors. Such proprietors have been very freely permitted to erect wharves, and even to make new land by filling the flats in front of their land. We are not aware that the State has ever laid claim to any wharf so built, or any land so made, unless the cove lands filled by the city of Providence can be considered an exception. Our harbor line acts are to be construed in the light of this doctrine and practice. The establishment of a harbor line, when so construed, means that riparian proprietors within the line are at liberty to fill and extend their land out to the line. A harbor line is in fact what it purports to be, the line of a harbor. It makes the boundary of a certain part of the public waters which is reserved for a harbor. The part so reserved is to be protected from encroachments. The rest is to be left to be filled and occupied by the riparian proprietors. Its establishment is equivalent to a legislative declaration that navigation will not be straitened or obstructed by any such filling out. . . . We think, however, it would be going too far to hold that the mere establishment of a harbor line conveys all within the line absolutely to the riparian proprietors. This would make all within the line private property, and extinguish the public rights of navigation and fishery. We think the establishment of a harbor line, if it is to be construed as a conveyance, is to be construed as a conveyance which at least is subject to those rights, until they are excluded by filling or wharfing out. But it is not necessary for us to go even so far as that in the case at bar. It is enough for the respondents if we hold that the establishment of a harbor line operates as a license or invitation to the riparian proprietor to fill or wharf out to that line. We think it has at least such an effect."

In *Bailey* v. *Burges*, 11 R. I. 330, a riparian owner had conveyed to trustees certain real estate lying on the east bank of the Seekonk river. It was platted into lots before the deed of trust was made and the deed of trust conveyed the lots by number as platted. Some of these lots lay partly upon the

upland and partly upon the shore, and some extended over the shore beyond low-water mark; but all of them as platted were defined by a definite line as their western boundary, outside of which there were no lots platted below high-water mark. Since the plats and deed were made, a harbor line had been established by the General Assembly, running outside of said lots and in front of them; and the bill in that case alleged that doubts had arisen as to whom the land between the water line or westerly line of said lots and the harbor line belonged, and whether or not it formed a part of the trust estate. The court, by Durfee, C. J., in giving the opinion, used this language : " In this state, at common law, the fee of the soil in tide-waters below high-water mark is in the state. It is true the riparian proprietor may fill out in front of his land, but, if he does so, he fills out by the permission or acquiescence of the state,—the establishment of a harbor line being at least equivalent to such a permission expressly given. Indeed, the Harbor Line Act referred to in this case does, in so many words, recognize the right to fill out to the line. When, therefore, Tristam Burges, previous to the establishment of a harbor line, conveyed lots which extend to or below high-water mark, he left nothing in front of the lots so conveyed which belonged to him, or which his heirs could inherit from him, the fee of the soil in front of the lots being in the state. The fact that the lots are defined by strict boundary lines is of no consequence ; for, if the grantee fills out in front of them, he will do so not under the deed, but by virtue of his riparian ownership, and he will take the land so filled not from Tristam Burges or his heirs or devisees, but from the state. If, however, any part of the western line of the lots does not extend to high-water mark, but leaves a strip or margin between it and high-water mark, such strip or margin, having never been conveyed to the trustee, belongs to the heirs or devisees of Tristam Burges, and they, not the trustee, are entitled by virtue of their riparian ownership to fill out to the harbor line. . . . We wish to say in conclusion that this opinion is given in view of the facts, that the harbor line was established after the execution of

24

the trust deed, and that no lots are platted outside of any lot conveyed by that deed, which lot extends to or below high-water mark. If these facts or any of them were different, other questions might arise which would demand consideration."

In connection with the concluding sentence of the opinion in *Bailey* v. *Burges*, it should be remembered that in the case at bar the harbor commissioners' assent to fill was given before the execution of the deeds to the complainants, and also that a street and another row of lots are platted outside of the lots conveyed by the respondent and his grantees to the complainants.

*Brown* v. *Goddard*, 13 R. I. 76, was a bill to establish a boundary line between riparian proprietors. The complainant and defendants in that case owned adjoining lots on a plat made by one Abbott which severally embraced both upland and land below high-water mark; but the lines below high-water mark were not run according to the rule laid down in *Aborn* v. *Smith*, 12 R. I. 370. One of the questions before the court was the effect of deeds of lots described by reference to their lot numbers as to land below high-water mark, the plaintiff who claimed under the grantee of lot No. 3 on the plat claiming that the deed of said platted lot No. 3 conveyed the upland as therein delineated, but not the land below high-water mark as embraced in said platted lot No. 3, but that as to the land below high-water mark he took under the rule laid down in *Aborn* v. *Smith*, which was quite different from the platted lot No. 3. The court, *inter alia* [p. 81], said : " We think that the lots which those deeds, not only the original but also the partition deeds, purport to convey are lots extending indefinitely out into the river between parallel lines forty feet apart, and that if we give the deeds effect according to their terms or intent, the defendants have committed no encroachment. The question then is,—Can we or shall we give them effect in that manner? The deeds purport to be absolute conveyances of land under tide-water. Of course they were ineffectual to pass the title to any such land, the fee being in the state. We cannot give the deeds

effect as absolute conveyances. But the grantor, though he had no actual title, and accordingly could convey none, yet had a sort of inchoate or potential title by virtue of his right to fill out under leave of the state, and this, under deeds purporting to convey the lots as platted, would enure to the benefit of the grantees, agreeably to the plat by way of estoppel or agreement enforcible in equity. The case stands in this wise : A hundred and fifty years ago, Daniel Abbott owned the entire tract of land at India Point. Whatever right or privilege there was to fill out into the river appertained to him as riparian proprietor. He platted his land, extending the lateral lines of the lots south of Shore, or India street, indefinitely out into the river. Now if, before giving any deed, he had filled out his land as far as the state would permit, and then had conveyed the lots as platted, there can be no doubt that his grantees would be entitled to the lots as platted, and only as platted. But he had a right, without filling out his land, to prescribe the terms on which he would part with it, and did prescribe the terms, impliedly at least, when he conveyed the lots as platted. His grants so made were all subject to an implied contract or assurance on his part, that his grantees should have not only the upland, but also whatever right or privilege he himself had to fill it out, and incorporate with it the tide-flowed flats and river bed as platted, and were also subject to an implied contract on the part of the grantees, that in filling out they would keep within the lines of the lots as platted." The bill was dismissed.

See also *Thornton* v. *Grant*, 10 R. I. 477 ; *Providence Steam Engine Co.* v. *Prov. & Stonington Steamship Co.*, 12 R. I. 348 ; *Allen* v. *Allen*, 19 R. I. 114 ; *Carr* v. *Carpenter*, 22 R. I. 528.

The cases above referred to are so apposite and authoritative as to enable us to deduce conclusions therefrom sufficient to control the case at bar.

When the respondent made his plat, by reference to which he afterwards sold to the complainants or their immediate grantors, he, as owner of land bordering on tide-water, had

the right to fill out below high-water mark as far as it afforded no objectionable obstruction to navigation, the question as to what constituted objectionable obstruction being one for the determination of the State acting through its duly authorized representatives or officials. As we have before stated, we think that the assent of the harbor commissioners to fill out below high-water mark, as to the territory it applies to, is as authoritative as the establishment of a harbor line is as to the more extensive territory it applies to, and both operate as an authoritative declaration that navigation will not be straitened or obstructed by any such filling out, and as a license or invitation to the riparian proprietor to fill out to that line. We need not in this case consider the question as to the exact nature of the respondent's title to the land below high-water mark, for this not being a suit for a breach of warranty of title, the only question before us is whether the respondent as against the complainants is entitled to fill out as according to the allegations of the bill he is doing, for as said in *Brown* v. *Goddard, supra,*—"the grantor, though he had no actual title, and accordingly could convey none, yet had a sort of inchoate or potential title by virtue of his right to fill out under leave of the State; and this under deeds purporting to convey the lots as platted, would enure to the benefit of the grantees, agreeably to the plat by way of estoppel or agreement enforcible in equity."

We think that the respondent as the riparian proprietor had the right to make the plat referred to as "Complainants' Exhibit A" and to convey to his grantees by deed the lots as platted thereon and that the limits of the respective lots so conveyed, whether in whole or in part under high-water mark, fixed the bounds of the rights acquired by the respective purchasers thereof. See especially *Brown* v. *Goddard, supra; Bailey* v. *Burges, supra,* and *Steam Engine Co.* v. *Steamship Co., supra,* in which latter case Durfee, C. J. said,—(12 R. I. p. 355): "We think the first defence, to wit, that the way or street was never lawfully created, cannot be maintained; for though it may be true that the way or street had no actual existence when the conveyances under which it

is claimed were made, we think it had nevertheless what may be called a potential or prospective existence, which would become actual whenever the place for it should be filled and incorporated with the upland, and though the conveyances when executed may have been ineffectual to create the way or street, because the site of it was flowed by tide-water, yet we think they were binding by way of estoppel on parties and privies, so that in equity, at least, the said parties and privies could not refuse to allow the way or street as soon as the land designated for it became capable of supporting it. The ground of the estoppel is, that the easements and servitudes indicated by the plat constitute a part of the consideration for which all conveyances referring to the plat are made, and therefore no person, while claiming under the conveyances, can be permitted to repudiate them or to deny that they exist where they are capable of existing." And in the same case, p. 369, Potter, J. concurring said : "The next question, and a very important one, is whether the person having the right to wharf out or fill up to can convey this right separate from the upland. If the street can be held as a street by estoppel, there is no reason whatever why the same doctrine should not be applied to the lots then under water. The street is laid out for the lots and not the lots for the street. Unless the lots then under water were to be filled, the street would have been of little or no value. The right has been recognized in many States without any reference to the principle of estoppel."

We think that the complainants had no right to fill westerly of the westerly line of the street lying westerly of their lots, designated as Edwin street ; that they had the right to fill the location of said street because the use of said Edwin street was a privilege and appurtenance belonging to their said lots and they were entitled to make it passable as a street if they saw fit. The respondent also had the right to fill in said Edwin street easterly to the westerly line of the complainants' lots as platted. Westerly of the westerly line of said Edwin street the respondent and his grantees of lots westerly of said street were alone entitled to fill out as far as license

had been given to them under the assent of the harbor commissioners.

With the views we entertain of this case we see no significance in the complainants' allegation as to their understanding of where high-water mark was at the time of receiving their deeds, as there is no warranty or guaranty of any particular grade or level of the lots in any of the deeds.

We have refrained from referring to any consideration applicable to a part only of the complainants' lots, but have confined our attention solely to considerations that apply to all alike, as this latter class of considerations is all sufficient for the determination of this case, and hence no reference has been made to the "*refusal*" or option to purchase, contained in the deeds to the complainant Bell, since that "*refusal*" or option to purchase, in the present aspect of the case certainly does not help her condition.

Inasmuch as the views expressed must result in the dismissal of the complainant's bill, we see no reason to consider the first two grounds of demurrer.

In our opinion the demurrer must be sustained and the bill dismissed.

Decree accordingly.

*A. B. Crafts and F. C. Olney*, for complainants.
*Tillinghast & Tillinghast*, for respondents.

### Complainant's Exhibit I.

COMPLAINANT'S EXHIBIT A.

Received for record this 23d day of November, 1896, at 2:15 o'clock, P. M.

MARK H. WOOD,

*Town Clerk.*

Replat of a part
of
BAY SPRING PLAT,
Arranged and platted by J. A. Latham,
June, 1874.

NOTE.—The following decision of the court in a jury trial waived case is referred to in *Hall* v. *Greene*, 24 R. I. 287.