# DISTRICT OF COLUMBIA *v.* CROPLEY.*

# CROPLEY *v.* DISTRICT OF COLUMBIA.

STATUTES; MUNICIPALITIES; SEWERS; NUISANCE.

1. In construing a conveyance by the District of Columbia of public land authorized to be sold by act of Congress, if the meaning of the words of the statute or of the conveyance be ambiguous or doubtful, they must be taken most strongly against the grantee and in favor of the public.

2. A grant by the legislature of land bounded by the sea or by navigable tide-water does not pass title below high-water mark, unless either the language of the grant or long usage under it clearly indicates that such was the intention.

3. There is nothing in the acts of Congress of March 2, 1881, and April 1, 1882, empowering the Commissioners of the District of Columbia

---

*Title to Land Below High-Water Mark.*—As to title to land under water, including the attitude of the Federal courts on such subject, see the presentation of the authorities in editorial note to *Goff* v. *Cougle,* 42 L. R. A. 161; as to title to land between high and low water mark, see the presentation of the authorities in editorial note to *Waverly Water Front Improv. & Development Co.* v. *White,* 45 L. R. A. 227; as to effect of bounding grant on river or tide water, see the presentation of the authorities in editorial note to *Hanlon* v. *Hobson,* 42 L. R. A. 502.

Mr. Farnham, in his work on Waters, § 414, after stating that, under the ancient common-law rule, the shore was regarded as a part of the upland and would pass by the grant of the upland, and that the later decisions limiting the grant to high-water mark ignored this ancient rule, says: "However, after the shore was given a distinct character of its own, the rule of strict construction was, as it would seem, erroneously, though generally, applied to grants affecting it, and in most instances this is a rule of property, so that it must be upheld on the principle of *stare decisis.* Under this rule a grant of land bounded by tide water passes title only to high-water mark. This line is the line of ordinary high tide, and not of the highest spring tide. So strictly is this rule adhered to in some instances that even though the calls of the grant would extend into the water and convey the shore and a portion of the soil below low-water mark, they will be restricted to high-water mark. Pennsylvania, while refusing to follow the common-law rule with reference to the title to the soil under nontidal navigable rivers, has followed it with reference to the title to the shore, so that in that state a grant bounded by tide water is presumed to go to low-water mark."

to sell at public auction certain water lots in Georgetown belonging to the District of Columbia, which authorized the sale of land under the waters of the Potomac river; and a conveyance by the Commissioners of such lots, describing the land conveyed as extending to the middle of the channel of the Potomac river, will operate to convey title only to high-water mark, in the absence of evidence showing a contrary legislative intent.

4. Not only has a municipal corporation no implied or incidental authority to alien or dispose of, for its own benefit, property dedicated to or held by it in trust for the public use, or to extinguish the public use in such property, but it has no such power to restrict the use in such manner as to impair the full enjoyment thereof by the public, except it be by express legislative authority.

5. No right of action against the District of Columbia, as for a nuisance, lies on the part of the purchasers of water lots in Georgetown, D. C., sold and conveyed to them by the Commissioners of the District of Columbia under authority of acts of Congress of March 2, 1881, and April 1, 1882, authorizing the Commissioners to sell at public auction such water lots belonging to the District of Columbia, for allowing sewage to flow to the Potomac river at the point of discharge, even though the sewage may have increased in quantity, through the main sewer of Georgetown, the course of which, in the proximity of and upon such lots, had long been established at the time of such conveyance and which was made in reference thereto; or for the subsequent diversion of the sewage from its original course to a different place of discharge, in the absence of any element of negligence or any claim of alleged defective or insufficient construction of the sewer.

6. In the absence of want of good faith on the part of the municipal authorities in changing the course of a sewer, the law will not hold the municipality responsible for the exercise of their judgment and discretion in planning the work.

Nos. 1291 and 1292.    Submitted October 13, 1903.    Decided February 3, 1904.

HEARING on an appeal and a cross-appeal from a judgment of the Supreme Court of the District of Columbia in an action to recover damages from the District of Columbia for an alleged nuisance in the maintenance of a certain sewer and for a diversion of water.                                    *Affirmed.*

The COURT in the opinion stated the case as follows:

This action was instituted in the court below by the plain-

tiffs, Cropley, Boteler, and Crampton, appellants in this court, against the District of Columbia, for an alleged nuisance in maintaining a certain sewer, and the diversion of water from a tail race, the original sewer, in the city of Georgetown, in said District.

The declaration contains three counts. To this declaration the defendant pleaded the general issue plea of not guilty, and the statute of limitations.

Upon trial, verdict and judgment were rendered for the defendant on the first and third counts of the declaration, and for the plaintiff for one cent damages on the second count of the declaration; and judgment was entered thereon; and, upon exception taken, appeals were taken by both parties to this court.

By the first count of the declaration, it is alleged that the plaintiffs were lawfully seised and possessed of certain parts or parcels of land known and distinguished upon the public plats and plans of the former city of Georgetown, in the District of Columbia, as and being lots 27, 28, and part of lot 29, of what are called the "water lots," the same being within the metes and bounds set forth in said first count, and which description is the same contained in a certain deed, given in evidence, made by the Commissioners of the District of Columbia to the plaintiffs, on the 12th day of January, 1885; that there was a wharf or dock built thereon by the plaintiffs, some time after the date of the deed just referred to, in order that access by water might be had; and that, upon said land, there was flowing a stream of water which could and would have been used as a source of water power; and that the defendant intending to injure the plaintiffs, and to deprive them of the use of said premises, and particularly of said water power, on, etc., wrongfully and injuriously kept and maintained a certain public sewer, etc., and by means of said sewer, etc., unlawfully, etc., discharged into said stream, and over, upon and across said land and premises of the plaintiffs, large quantities of sewage, and whereby also large quantities of earth and sewage were deposited in the Potomac river immediately in front of, and adjacent to, plaintiffs' said wharf, so as to injuriously interfere with access to said

wharf and premises by water; and whereby also offensive gases emanating from said sewer were carried to, on, and over the plaintiffs' said premises, to their great damage.

By the second count of the declaration the premises are described as in the first count, and the wrongs alleged are: That at the time of committing the grievances by the defendant, complained of by the plaintiffs, there was flowing a stream of water, which, but for the committing of the wrongs by the defendant, could and would have been used as a source of water power of great force, to wit, of certain mentioned power and value, and had a great annual rental value, yet the defendant, well knowing the premises, but injuriously and wrongfully intending to deprive the plaintiffs of the use and benefit of their said water power, did, on, etc., unlawfully enter upon said land and premises of the plaintiffs, and wrongfully and injuriously, by means of a certain covered ditch or pipe constructed by the defendant, from a point near the northern line of said premises of the plaintiffs, and thence for a distance of, to wit, 25 feet, through the said land of the plaintiffs to the adjoining premises on the west, and thence to the Potomac river, diverted, and ever since that date has continued to so divert, all of said stream of water from said land and premises, etc., into and through said ditch or pipe constructed by the defendant to the Potomac river; in consequence whereof, said water power ever since the said 15th day of January, 1899, has been entirely taken away from the said land and premises of the plaintiffs,— whereby the plaintiffs have been deprived of any benefit, use, or enjoyment of or from a large portion of their said land and premises, and from using or leasing the said water power, etc.; from all which effects of said wrongful acts of the defendant, the value of the annual rental of said land and premises has been greatly depreciated and rendered of no value, etc.

The third count of the declaration states and describes the premises as in the first, and then alleges that thereon there was flowing a stream of water, which, but for the wrongs alleged, could and would have been used as a source of water power of great force and value, yet the defendant, well knowing the

premises, but contriving and wrongfully intending to injure the plaintiffs, and to deprive them of the use, benefit, and enjoyment of said premises and appurtenances, and particularly of said water power, on the 23d day of November, 1896, and thenceforth to January 15, 1899, wrongfully and injuriously kept and maintained a certain public sewer, having an outlet at or near the northern line of said premises, and by means of said sewer the defendant continuously from, to wit, the 23d day of November, 1896, to the 15th day of January, 1899, wrongfully and injuriously discharged into said stream, and over and upon the land of the plaintiffs, large quantities of sewage, night-soil, and other filth, and theretofore wrongfully entered upon said land and premises of the plaintiffs, and wrongfully and injuriously, and by means of a certain covered ditch or pipe, constructed by the defendant, from a point near the northern line of said premises of the plaintiffs, and thence for a distance of 25 feet through the land of the plaintiffs to the adjoining premises on the west, and thence to the Potomac river, diverted, and ever since said last-mentioned date, has continued to divert, all of said stream of water from said land and premises of the plaintiffs, into and through said ditch or pipe to the Potomac river; in consequence of which said wrongful and injurious diversion of said stream the said water power was thereby entirely destroyed, etc., whereby, and by reason of all such wrongful and injurious acts of defendant, large quantities of earth, sewage, filth, sand, and other solid material, were deposited in the Potomac river immediately in front of and adjacent to the plaintiffs' wharf, between the 23d day of November, 1896, and the 15th day of January, 1899, so as to injuriously interfere with access to said wharf and premises by water; and whereby also, during said period, offensive and ill-smelling gases emanating from said sewer, and from the matter discharged therefrom, were carried to, on, and over the plaintiffs' land and premises, whereby the plaintiffs from the time aforesaid were deprived of any benefit, use, or enjoyment of or from a large portion of their said land and premises, and from using or leasing the same with the water power there-

on, etc., and thereby the land and premises of the plaintiffs were greatly depreciated and lessened in value.

In support of the case as set forth in the several counts in the declaration, the plaintiffs read in evidence two acts of Congress, an original and amendatory act,— the first being an act approved March 3, 1881, and the second approved April 1, 1882. By § 3 of the last-mentioned or amendatory act, it is provided: "That the Commissioners of the District of Columbia be and they are hereby authorized and empowered to sell and convey, to the highest bidder, at public auction, the following-named property, belonging to the said District of Columbia, in Washington City: Lot 3, square 382, part of lot 3, square 490, and parts of lots 1 and 17 in square 372; and also the following-named property in the city of Georgetown, belonging to said District: Fish-Wharf, on square 6, part of lots 47, 48, and 49 in square 30, and part of lot 245 in square 99."

The plaintiffs also read in evidence § 12 of the act of Congress of 1805, amendatory of the charter of the city of Georgetown, wherein it is declared and provided that said corporation should have power and authority to open, extend, and regulate streets within the limits of said town; and also "to make and keep in repair all necessary sewers and drains, and to pass regulations necessary for the preservation of the same." There were also read in evidence certain ordinances, orders, and resolutions of the corporation, in respect to the sewer involved in this litigation, for the repair and preservation of the same.

By § 95 of the Revised Statutes relating to the District of Columbia, it is provided that the charters of the cities of Washington and Georgetown, severally, shall be continued for certain designated purposes; and, by § 96 of those statutes, it is provided that "the District of Columbia is [and shall be] the successor of the corporations of Washington and Georgetown and all the property of said corporations and of the county of Washington [shall be and] is vested in the District of Columbia."

It appears that shortly after the passage of the act of Congress of April 1, 1882, authorizing the sale of lots and parts of

lots of ground in Georgetown, there was sale made to the plaintiffs of lots 27, 28, and part of lot 29, of the "water lots" so called, the same being described in one parcel as follows, that is to say:

"Beginning at a point on the south side of Water street, at the northeast corner of said lot numbered 27, and running thence westerly with the south line of Water street, 81 feet, 6 inches, to the northwest corner of said lot numbered 28; thence southerly with the west line of said last-mentioned lot, 56 feet; thence due west, 22 feet and 6 inches; thence southerly by and with the west side of a tail race as now existing, 128 feet and 3 inches to the wharf line of the Potomac river, and continuing the same course onward to the middle of the channel of said river; thence by and with the middle of the channel, to a point which will be intersected by the east line of said lot numbered 27 protracted to said middle of the channel, and thence by and with said last-mentioned line reversed to the place of beginning, the same, as to the part between the said Water street and the wharf line, being delineated upon a plat thereof, hereto annexed and made a part hereof, said property being formerly called and known as the 'fish-wharf' property, and extending from Water street to the channel of the Potomac river in said city of Georgetown in said District." Together with all the improvements, ways, waters, easements, privileges, appurtenances, etc., to the said lots belonging.

At the time of the purchase of the property by the plaintiffs, and for a long time before, they had been residents of the city of Georgetown, and must, therefore, be supposed to have known of the existence and location of the main sewer of the town, and especially as a large part of the sewer in question was open. But before the sale of the property, according to the testimony of one of the plaintiffs, he made an examination of the premises, and he saw the tail race, and the water running therein to the Potomac river; and with the knowledge thus possessed the plaintiffs purchased the property. As matter of fact, for a long time before and after the sale to the plaintiffs, the principal sewer or drain of the city of Georgetown discharged its con-

tents through that sewer or tail race into the Potomac river. This sewer, it appears, flowed underneath the Chesapeake & Ohio canal, located north of Water street, and passed under two mills, then under Water street, and thence into the tail race, emptying into the river.     These two mills, situate north of Water street, were, at the time of the purchase of the property, and for more than twenty-two years prior thereto had been, supplied with water power from the Chesapeake & Ohio canal, by means of conduits or flumes, through which the water passed from the canal to the mill wheels.     The sewer, which was open and passed under the mills as just stated, received the water from the first mill after it had left the flume and had served the purpose of the mill.     The sewer, thus augmented by the water from the first mill, passed on down under the second mill, where it received the water of that mill in the same manner as it had received the water from the first mill; and thereafter the commingled waters of the two mills, together with the ordinary sewage of the town, flowed out through the sewer way or tail race into the river.     Some years prior to 1898 another mill was erected south of Water street, known as Hill's mill, and which also derived its supply of water from the canal, and that water was, by an agreement with the plaintiffs, conducted over the land of the plaintiffs and discharged into the sewer or tail race.

It is shown by the evidence that, at the time of the purchase of the property by the plaintiffs, the sewage of a large part of Georgetown was conveyed to and was passed off into the river, by means of this sewer or tail race; but the drainage into this sewer was largely surface or open drainage, though some part of it was by covered underground drains.     But as the city of Georgetown increased in population, greater sewage capacity became necessary, and therefore two new sewers were laid, thus increasing from time to time the quantity of sewage flowing through the tail race; so that in the year 1898 and afterward the quantity of sewage passing through the tail race was considerably more than it was at the time of the purchase of the property by the plaintiffs and prior thereto; and consequently, according to the evidence on behalf of the plaintiffs, during the

three years immediately preceding the institution of this suit, which was on the 8th day of January, 1901, large quantities of offensive matter and substances such as are generally found in city sewers, were discharged into and through the tail race, and the quantities of such offensive matters and odors therefrom were particularly observable after heavy rains.

It is also shown by the plaintiffs that, soon after they became owners of the land described in the deed, they erected a wharf along the river front of the property, though the precise location of this wharf is not shown by the evidence in the bill of exception. There is evidence, however, to show that in the early part of the year 1899, it was discovered that there was a large accumulation of the sewage matter discharged from the tail race, settled in front of the wharf, and thus lessening the depth of the water, so that vessels of more than 9 or 10 feet draft could not reach the wharf.

It is also shown by the evidence that the course of the old original sewer north of Water street had been changed some time prior to January, 1899, so that, instead of running under the mills north of Water street as formerly, it was made to run around outside the mills, and parallel with its former course, down through Potomac street, and through an underground sewer way. This new course of the sewer, however, led into the tail race, and so far as the plaintiffs are concerned it does not affect them in any respect whatever.

The evidence shows that the municipal authorities had also constructed upon the land immediately west of that of the plaintiffs (said land being owned by Mr. Cissel), an arched drain or sewer, connecting with the original sewer or tail race and leading to the Potomac river on the south and west of the said tail race or old sewer. These new constructions, and their relation to and connection with the old sewer, and to and with the tail race, are delineated on a diagram used at the argument, and the correctness of which has not been questioned.

The plaintiffs also produced evidence to show that the water flowing from the tail race (being the water drawn from the Chesapeake & Ohio canal and discharged from the mills) before

the diversion thereof by the sewer through Cissel's land, and exclusive of the sewage flowing through it, was capable of furnishing water power as it passed through the tail race; that this water power would have enhanced the rental value of the property from $1,000 to $1,600 annually, but it was rendered entirely useless because of the sewage which would interfere with any wheel to be turned by the water; and that the rental value of the property was decreased because of the offensive odors arising from the sewage before its diversion as before described.

But, as reflecting upon the question of the right of exclusive use and control by the municipal corporation, of the original sewer or tail race, from the south line of Water street to the Potomac river, it was shown in evidence that, shortly after the purchase of the property mentioned in the deed given in evidence by the plaintiffs, they, together with G. W. Cissel, the owner of the western adjoining lot or half lot, 29, by letter dated 24th day of April, 1885, addressed to the Commissioners of the District of Columbia, said: "We, the undersigned, owners of lot 29 of the water lots situated on the south side of Water street, in Georgetown, or West Washington, D. C., propose improving said lots, which is impossible so long as the government sewer remains open on the property. We therefore request you to have the same covered to the point where it empties in the river, at as early date as possible, so that we can fill over and build on it. Yours, etc." The response to this request was, that it could not be complied with at that time, because there was no appropriation available to enable the Commissioners to have the work done. But since that time there has been a covered sewer made, by which the contents of the old sewer or tail race have been given a different point of discharge.

It is upon this state of facts that the plaintiffs have brought this suit, and claim to recover damages for an alleged nuisance supposed to have been committed by the District of Columbia, during the time the sewer flowed over their land, and by reason of which supposed nuisance they had been deprived of the use, as they allege, of the water flowing through the old sewer or tail

race, to the injury and depreciation of their property; and also to recover damages for the diversion of the water flowing through the tail race or sewer, whereby they were deprived of the water from the time it was diverted as before stated.

*Mr. Charles L. Frailey,* for the appellants in No. 1292, and for the appellees in No. 1291, *Mr. A. S. Worthington* being of counsel:

1. The question of the liability of the District of Columbia for the nuisance committed by it in maintaining upon the plaintiffs' land a sewer should have been left to the jury. The sewer was not an easement subject to which the plaintiffs purchased their property. Washburn, Easem. & Serv. pp. 2, 3, 150 and cases cited; Wood, Nuisances, § 723. The sewage running through the tail race was a nuisance committed by the District of Columbia for which a right of action accrued to the plaintiffs. *Haskell* v. *New Bedford,* 108 Mass. 208, 215, 216; *Brayton* v. *Fall River,* 113 Mass. 218, 227, 230; *Boston Rolling Mills* v. *Cambridge,* 117 Mass. 396, 400; *Nevins* v. *Fitchburg,* 174 Mass. 545; *Blizzard* v. *Danville,* 175 Pa. 479–483; *Owens* v. *Lancaster,* 182 Pa. 257; *Clark* v. *Peckham,* 9 R. I. 455–468; *Sleight* v. *Kingston,* 11 Hun, 594; *Chapman* v. *Rochester,* 110 N. Y. 273; *Bolton* v. *New Rochelle,* 84 Hun, 281; *Mining Company* v. *Joplin,* 124 Mo. 129–136; *O'Brien* v. *St. Paul,* 18 Minn. 176–182; *Moody* v. *Saratoga Springs,* 45 N. Y. Supp. 365 (17 App. Div. 207); *Franklin Wharf* v. *Portland,* 67 Me. 46–59; *Jacksonville* v. *Doan,* 145 Ill. 23–26; *Bloomington* v. *Costello,* 65 Ill. App. 407–409; *Platt Bros.* v. *Waterbury,* 72 Conn. 531, 48 L. R. A. 691, and note; *Edmondson* v. *Moberly,* 98 Mo. 523–526; *Richardson* v. *Boston,* 19 How. (U. S.) 263–270.

The District did not acquire by prescription any right to commit the nuisances complained of. *Folkes* v. *Chad et al.* 3 Doug. 340, 343; *Dygert* v. *Schenck,* 23 Wend. 446, 448; *Renwick* v. *Morris,* 7 Hill (N. Y.) 575, 576; *People* v. *Cunningham,* 1 Denio, 524, 536; *Boston Rolling Mills* v. *Cambridge,* 117 Mass.

396, 400; *Nolan* v. *New Britain,* 69 Conn. 668–683; *Smith* v. *Sedalia,* 152 Mo. 283, 297; *Platt Brothers* v. *Waterbury,* 72 Conn. 531.

2. The plaintiffs had a right to use, for any lawful purpose, the water flowing through the tail race, and could not be deprived of such use by any stranger without a right of action accruing to them. This principle applied before the diversion of the water in January, 1899. *Arkwright* v. *Gell,* 5 Mees. & W. 203, 233; *Jones* v. *Jackson,* 9 Cal. 237; *Shepardson* v. *Perkins,* 58 N. H. 354. The same principle applied to the diversion of the water in January, 1899. Washburn, Easem. & Serv. 4th ed. ch. III. § 4, p. 420. Actual compensatory damages may be recovered for the unauthorized pollution or diversion of a stream of water flowing through a person's land, and a proper element of the measure of such damages is the depreciation in the rental and general value of the land. (a.) For pollution of water: *Kiel* v. *Jackson,* 6 L. R. A. (Colo.) 254; *Ferguson* v. *Firmenich Co.* 77 Iowa, 576, 581; *City* v. *Simmons,* 86 Ala. 515, 518; *Chipman* v. *Palmer,* 9 Hun, 517, 518; *Pinney* v. *Berry,* 61 Mo. 359, 368; *Seely* v. *Alden,* 61 Pa. 302. (b.) For diversion of water: *Colrick* v. *Swinburne,* 105 N. Y. 503, 506, 507; *Hart* v. *Evans,* 8 Pa. 13, 21, 22; *Finley* v. *Hershey,* 41 Iowa, 389, 394; *Pollitt* v. *Long,* 58 Barb. (N. Y.) 20, 35; *Honsee* v. *Hammond,* 39 Barb. (N. Y.) 89, 94.

*Mr. A. B. Duvall,* Corporation Counsel, and *Mr. E. H. Thomas,* Assistant, for the District of Columbia.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

1. The first question presented and necessary to be decided is as to the true construction of the act of Congress of April 1, 1882, authorizing the sale of the property in question; and what was really authorized to be sold and conveyed thereunder, —whether the deed given in evidence by the plaintiffs conforms to the authority of sale and conveyance given by the act of Congress, as to the extent of the property described in the deed.

The property authorized to be sold is declared by the act of Congress to belong to the District of Columbia, but there is no other description of the property than the numbers of the lots, denominated water lots, and the square in which they are situated, that is to say, bounding upon the water of the river. But from what source, and in what manner, the municipal corporation derived title to the property is not shown; nor is it shown what has been the nature and extent of the use of the property since the title was acquired by the municipality. The deed describes the river line of the property as extending to the middle of the channel of the Potomac river, a tidal, navigable stream; and it is to this extent that the claim is made in this case in respect to the alleged obstruction to the wharf. There is no question of prescription in the case, nor of adverse possession. The plaintiffs only acquired by their purchase the title to the property that was lawfully vested in the municipal corporation of the District of Columbia. There is nothing in the terms of the act of Congress authorizing the sale, to require or that would justify the extension of the south or water line of the lots authorized to be sold, to the middle of the channel of the river; and to so hold, in view of the well-settled principles of law, would be a forced construction of the terms of the act, and such as the court is not authorized to adopt. It is a universal principle applicable in such cases, that if the meaning of the words of the statute or conveyance be doubtful or ambiguous, they must be taken most strongly against the grantee and in favor of the public, and therefore should not be extended by implication beyond the natural and obvious meaning of the words; and if these do not support the claim it must fall. *Minturn* v. *Larue,* 23 How. 435, 16 L. ed. 574.

It has long since been settled, and recently most unqualifiedly affirmed by the highest authority of the country, that the grant by Charles I. to Lord Baltimore, on the 20th of June, 1632, included in unmistakable terms the Potomac river, and that the territory and title thereby granted were never devested, and upon the Revolution the State of Maryland became possessed of the navigable waters of the state, including the Potomac

river, and of the soils thereunder; and, by the act of cession to the United States, that portion of the Potomac river with the subjacent soil, which was appurtenant to and part of the territory granted, became vested in the United States, as the owner thereof. *Morris* v. *United States,* 174 U. S. 196, 43 L. ed. 946, 19 Sup. Ct. Rep. 649. In that case it was said and held, that, "upon the Revolution, the State of Maryland became possessed of the navigable waters of the State, including the Potomac river, and of the soils thereunder, for the common use and benefit of its inhabitants; and that, by the act of cession, that portion of the Potomac river, with the subjacent soil which was appurtenant to and part of the territory granted, became vested in the United States." See that part of the opinion relating to the claim of the Marshall heirs, from pp. 227 to 232, and also that part that relates to the Kidwell patent, from pp. 232 to 244. There is nothing in this case to justify the conclusion that it was the intention of Congress, by the acts of 1881 and 1882, to subject the land lying beneath the waters of the Potomac and within the limits of the District of Columbia to sale by auction by the Commissioners. P. 234.

The principle of construction of public grants of land, bounded by tidal navigable rivers or streams, has been laid down in many decisions by the Supreme Court; and in the comparatively recent case of *Shively* v. *Bowlby,* 152 U. S. 1, 13, 38 L. ed. 331, 336, 14 Sup. Ct. Rep. 548, 552, referred to and quoted from with approval by the court in the case of *Morris* v. *United States,* 174 U. S. 196, 43 L. ed. 946, 19 Sup. Ct. Rep. 649, it is said by the court: "It is equally well settled that a grant from the sovereign of land bounded by the sea or by any navigable tide water, does not pass any title below high-water mark, unless either the language of the grant, or long usage under it, clearly indicates that such was the intention." And further on in the same opinion it is said: "Upon the acquisition of a territory by the United States, whether by cession from one of the States, or by treaty with a foreign country, or by discovery and settlement, the same title and dominion passed to the United States, for the benefit of the whole people and in trust for the

several States to be ultimately created out of the territory" so acquired.

It is quite clear, we think, there is nothing in the acts of Congress of March 2, 1881, or of April 1, 1882, that authorized the sale and conveyance of land under the water of the Potomac river; but, by the most liberal construction of those acts, the lots or parts of lots authorized to be sold and conveyed did not extend further down than to high-water mark.   If Congress had intended to dispose of land in the bed of the river, and out to the central line of the channel, as was attempted to be done by the deed made by the Commissioners, it is reasonable to presume that the act conferring authority to sell the lots would have so expressly declared.   At any rate, it was incumbent upon the plaintiffs to show by *clear and unmistakable evidence* that the United States had been devested of title to the land under the water below high-water mark and out to the middle of the channel, before the plaintiffs, or those under whom they claim, could succeed in supporting a claim in respect to the land below high-water mark.   The record before us furnishes no such evidence; and the deed in evidence can have no operation to convey title to land below high-water mark.

2. The next question is as to the rights of control of the city of Georgetown, now part of the District of Columbia, over the main sewer south of Water street leading to and emptying into the Potomac river, and which received the water from the mills mentioned in the evidence, and conveyed and discharged the same, with the sewage, into the river; and as to the right of the municipal corporation to change the course of the sewer and divert the flow of the water and sewage to another point of discharge into the river.

There is no question in this case as to negligence, or as to want of capacity of the sewer involved.   Nor is there any question as to the course and location of the original and long-existing sewer of the corporation furnishing the means of drainage for a large portion of the city of Georgetown.   This old and well-established sewer way, it appears, was adopted as a water discharge from the mills erected south of the Chesapeake & Ohio

canal, and north of Water street, and the water from those mills flowed under Water street and into the old open sewer way, and was discharged into the Potomac river, together with the ordi-nary sewage of the city. These mills have been dependent upon the supply of water that they could obtain from the Chesa-peake & Ohio canal in the ordinary course of its operation, and such water could only be obtained under the terms of the char-ter of the canal company, by lease or license, according to terms agreed upon. It is not shown in this case upon what terms and conditions the water was supplied to the mills by the canal com-pany. But what is called the tail race is nothing more than the former open sewer, perhaps enlarged and improved, the bet-ter to adapt it for discharging both the sewage of the city and the water from the mills. This was the condition of the prem-ises when the plaintiffs purchased the property described in the deed read in evidence, and it was plainly open to view at the time of the purchase. And now the question is made, as to how, and to what extent, if any, the right of control of the mu-nicipal corporation over this old and well-established, and, as we must presume, necessary sewer, has been affected by the pur-chase by the plaintiffs of water lots 27, 28, and half of lot 29, or, as described in the act of Congress, part of lots 47, 48, and 49 in square 30, under the act of Congress? Was it the inten-tion of Congress, by the act referred to, to authorize the Com-missioners of the District of Columbia to devest the municipal government of its rightful authority and control over this sewer, or to restrict such right of control to the extent of denying to the municipal government the right of enlarging the capacity of such sewer, and the sewers that lead thereto, to meet the health-ful requirements of the city, and from time to time to repair, and, if necessary, to make such changes in the location and dis-charge of such sewers, as circumstances might require? It would seem to be a very strained construction of the acts of Con-gress, and of the deed to the plaintiffs, to hold that they fur-nish evidence of any such intention. The right in and control over all the streets and sewers of the city are held by the mu-nicipal government for public use, and to no other use or pur-

pose can they be appropriated, without special legislative sanc-
tion. "It would," says the Supreme Court, "be a perversion
of that trust to apply them to other uses." *Meriwether* v. *Gar-
rett,* 102 U. S. 513, 26 L. ed. 204. The same principle is laid
down by Dillon, in his work on Municipal Corporations, § 650,
where he says: "A municipal corporation has no implied or
incidental authority to alien, or to dispose of, for its own bene-
fit, property dedicated to or held by it in trust for the public
use, or to extinguish the public uses in such property." And
clearly, if the corporation has no implied or incidental author-
ity to dispose of or extinguish the public use in such property,
it has no such power to restrict the use in such manner as to im-
pair the right of full enjoyment thereof by the public, except
it be by express legislative authority. This sewer has been, and
is still, one of the principal drains, if not the most important
drain, of the city. It is described in the bill of exception as the
main sewer of Georgetown; and it has continuously, from
and since the year 1852, until carried around through Potomac
street as set forth, remained uncovered after leaving the canal,
until it reached the north side of Water street, and after leaving
the south side of Water street, it remained open and uncovered
until it emptied into the Potomac river. It was because it was
a public sewer of the location described that the water from the
mills was turned into it, and it was used as a means of convey-
ing the water from the mills to the Potomac river; and it is
now sought to be established to be a regular watercourse; and
the ground of complaint is that it has been unduly polluted and
obstructed by the increase of sewage matter allowed to flow
therein; and finally, at the southern end thereof, that it has
been diverted from its original course and place of discharge.
The right of the municipality to use this sewer as a public drain
in the manner and to the extent that it has been used by it, prior
to the time of bringing this action, would seem to be clear. In-
deed, the plaintiffs fully recognized the right of the defendant
to use and control the sewer after they had purchased the lots
mentioned in the declaration and proof. By the letter of the
24th of April, 1885, addressed to the Commissioners, they ex-

pressly say, that, as owners of lot 29 of the water lots, they "propose improving said lot," which, as they said, was impossible so long as the government sewer remained open on the property. They therefore requested that the sewer should be covered to the point of discharge in the river, as soon as possible. It was not then a claim to the water that flowed down the sewer, or to any rights that they supposed themselves entitled to therein, but that the public sewer was open, and they desired to have it closed. The sewer was afterward closed or covered, as had been requested, and its course so changed as to cause its discharge at a different point on the river. This would seem to have accomplished what the plaintiffs desired, as they proposed building over the bed of the old sewer.

Upon the whole case, as presented by the pleadings and proof, we discover nothing that can justly entitle the plaintiffs to recover as for a nuisance against the defendant for allowing sewage to flow, even though it may have been increased in quantity in recent years, through and along the established course of the sewer to the river at the point of discharge; nor for the subsequent diversion of the sewage, mingled with the water discharged from the mills, by the covered sewer leading from the original sewer or tail race to the point of discharge on the river west of the place of discharge of the original open sewer. The most that is made to appear as furnishing the least ground of action is the technical breach of the plaintiffs' close, in entering therein and constructing the newly covered sewer through the western side or wall of the original sewer or tail race; this newly-constructed covered sewer being that which constitutes the diversion, of which complaint is made, and which leads to the new point of discharge on the river front. For this diversion of the sewage and water from the original sewer or tail race there can be no recovery against the defendant, there being no element of negligence, nor any claim for alleged defective or insufficient construction of the sewer. There is no question made as to any want of good faith on the part of the municipal authorities in making the change in the course of the sewer; and for the exercise of their judgment and discretion in

planning the work the law will not hold the municipality responsible.

As said by the Supreme Court of the United States, in a case taken up from this District: "The duties of the municipal authorities, in adopting a general plan of drainage, and determining when and where sewers shall be built, of what size and at what level, are of a quasi-judicial nature, involving the exercise of deliberate judgment and large discretion, and depending upon considerations affecting the public health and general convenience throughout an extensive territory; and the exercise of such judgment and discretion, in the selection and adoption of the general plan or system of drainage, is not subject to revision by a court or jury in a private action for not sufficiently draining a particular lot of land." *Johnston* v. *District of Columbia,* 118 U. S. 19, 20, 30 L. ed. 75, 76, 6 Sup. Ct. Rep. 923, 924. And if not liable for insufficient drainage of an adjoining lot, certainly not for the change or diversion of drainage to a more suitable point of discharge. For a very full discussion of the principle of exemption of municipal authorities from liability in this class of cases, see the case of *Merrifield* v. *Worcester,* 110 Mass. 216, 14 Am. Rep. 592, where it is said in the opinion of the court that "this exemption of municipal bodies and their officers from liability, and corresponding subordination of individual rights and interests to the safety, health, and welfare of the general public, is a principle of frequent application."

The court below directed a verdict for the defendant on the first and third counts of the declaration; but directed a verdict for the plaintiffs for nominal damages of one cent, under the second count of the declaration, upon the theory, as we suppose, that there had been an unlawful entry upon the plaintiffs' premises to construct the covered sewer to the new point of discharge. Both parties have appealed; but this court is not disposed to interfere with the rulings of the court below; and we shall therefore affirm the judgment on both appeals.

*Judgment affirmed.*