## UNITED STATES v. GROEN et al.

**No. 31578.**

District Court of the United States for the District of Columbia.

May 31, 1947.

Robert R. MacLeod, Nancita A. Smith, and Joe W. Ingram, all of Washington, D. C., for plaintiff.

Daniel Partridge, III, and Milton D. Campbell, both of Washington, D. C., for defendants.

LETTS, Justice.

This is an action brought by the United States under special Act of Congress approved April 27, 1912, 37 Stat. 93, for the purpose of establishing and clarifying the title to waterfront land on the Eastern Branch or Anacostia River (hereinafter designated as Eastern Branch) and to the adjacent shores, bed and waters of the river; to have a judicial determination of the nature and extent of any right, title and interest adverse to the title of the United States; and to ascertain the value of any such adverse right, title or interest.

The above-mentioned Act of Congress provides that the Attorney-General, when deemed proper, shall institute in this Court a suit or suits in the nature of a bill in equity "for the purpose of establishing and making clear the title of the United States" to waterfront lands in the District of Columbia; that there shall be named as parties defendant all "persons and corporations, or others," who have or claim to have any right, title, interest or claim to said land and adjacent water; that the defendants, after service of process, shall answer, set forth and maintain any right or claim they may have in the premises; that this Court shall have full power and jurisdiction to determine every question of such right, title or claim; and that if it shall be the determination of the Court that there exists any right, title, interest or claim adverse to the complete title of the United States, the Court shall forthwith and in a summary way ascertain the value of such adverse right or claim so that a report thereof shall be made to Congress.

The land and adjacent waters involved are described in the complaint as bounded on the West by Water Street, S.W., on the North and South by the North lines of S Street and T Street, S.W., respectively, and prolongations thereof to the "line of maximum depth" of the Eastern Branch; and on the East, by the "line of maximum depth" of the Branch. The land consists of Original Square East of 664 in the City of Washington, with adjacent portions of South Capitol and S Streets, S.W., and with adjacent artificial accretion or man-made fill. The parties are agreed and the evidence discloses that at the time of the laying out of the City of Washington and in the year 1794, the lots in Square East of 664 were of irregular depth ranging from 61 feet to 81 feet between the East line of Water Street and the then ordinary high water mark of the Eastern Branch. Since that time, the fast lands for the full width of the lots have been extended by artificial accretion or man-made fill Eastwardly into the Branch to the bulkhead line established by the Secretary of War for distances of approximately 366 feet along the South line of S Street and approximately 323 feet along the North line of T Street. A wharf approximately 65 feet wide and from 115 to 130 feet long projects into the river along the South line of S Street.

This action was instituted by the Government on January 30, 1913 but for reasons not disclosed of record, prosecution has been deferred. On May 29, 1946, the present defendants Lottie May Martin and The Smoot Sand and Gravel Corporation moved that they be substituted for all the original defendants, excepting James Martin. The substitution was allowed. The affidavit of John W. Gulledge, filed in support of the motion, discloses that since the commencement of this action Lottie May Martin has acquired the right and interest

of the previous owners of Lots 1 and 2, and of James Martin to Lots 6, 7 and 8; that James Martin has acquired the right and interest to Lot 3; and that the Smoot Sand and Gravel Corporation has acquired Lots 4 and 5. The parties have stipulated that whatever right, title and interest was acquired by the original allottees of the lots in the square has become vested in the present defendants, as follows: Lots 1, 2, 6, 7 and 8, Lottie May Martin; Lot 3, James Martin; and Lots 4 and 5, The Smoot Sand and Gravel Corporation.

Plaintiff concedes that defendants are vested with the fee simple title to the lots in Square East of 664 to the ordinary high water mark as it existed in the year 1794, with riparian rights. It is contended, however, that the United States is vested with full control, title and dominion of the Eastern Branch and its subjacent soil below the said high water mark; that the riparian rights of the defendants are limited to (1) a right to the continued flow of the river in its natural condition, (2) the right to natural accretion and reliction, subject to the result of any erosion, and (3) a right of access from their lands to the river analogous to that of an abutter on a highway; that the defendants and their predecessors neither have nor had a vested right to fill in or wharf below the natural high water mark of the river; that the defendants are not entitled to compensation for any filled land below the said high water mark; and that the United States is vested with full control, title and dominion of S Street, S.W. and South Capitol Street and of all natural or artificial accretion to such streets.

The defendants contend that they have title to the channel of the Eastern Branch either by virtue of the original allotments to their predecessors at the time of laying out of the City or by virtue of their riparian rights.

In view of the issues raised in this case, it may be well to advert briefly to the historical background of the founding of the City of Washington. The Charter of June 20, 1632, from Charles I, King of England, granted to Cecilius Calvert, First Lord Proprietary of Maryland, all lands now embraced within the District of Columbia and the State of Maryland, including the property and dominion of lands under navigable waters, together with the powers of government. By this charter, the property and dominion in navigable waters, and in the soil under them, passed as a part of the prerogative rights incidental to the political powers conferred on the Lord Proprietary, that is, as a concommitant of government or rex regalia, to be held in trust for the common use and benefit of the whole community, and not as private property for the individual gain of the patentee. Upon the American Revolution, the people of Maryland themselves became sovereign and in that character succeeded to all rights of the Lord Proprietary, and of the King and Parliament. These rights included the absolute right to all navigable waters and the soil under them, for common use by the people, subject only to the rights surrendered by the Constitution to the Federal Government. This right of dominion and property of navigable waters and the soil under them in the District of Columbia became vested in the United States, as sovereign, by the cession of the territory by the State of Maryland.

The State of Maryland, by Act of December 23, 1788, Md. Laws 1788, Ch. 46, D.C.Code 1940, P. XXVIII, ceded to the United States the territory which is now the District of Columbia. By Act of Congress, approved July 16, 1790, 1 Stat. 130, Ch. 28, D.C. Code 1940, P. XXXI, as amended by Act of Congress approved March 3, 1791, 1 Stat. 214, Ch. 17, D.C. Code 1940, P. XXXII, the cession was accepted and the President was authorized to appoint three Commissioners, who should, under the direction of the President, survey, define and locate the district for the permanent seat of government. The Commissioners were empowered to purchase or accept such quantity of land within the district as the President should deem proper for the use of the United States, and according to such plan as the President should approve, and the Commissioners were required to provide suitable buildings for the accommodation of the public offices prior to the first Monday in December, 1800, at which time the seat of

the Government should be transferred to the Federal City. By Proclamation of January 22, 1791 (Morris v. United States, 174 U.S. 196, 19 S.Ct. 649, 43 L.Ed. 946) and Proclamations of January 24 and March 30, 1791, D.C.Code 1940, PP. XXXII and XXXIII, the President located and defined the limits of the District of Columbia and appointed Commissioners who, with their successors, located and laid out the City of Washington.

The general boundaries of the proposed city were the Eastern Branch, the Potomac River, Rock Creek to a point near P Street, N.W., then following what is now Florida Avenue to 15th. and H Streets, N. E., then South to C Street, N. E., then East to 20th. Street, and then South to the Eastern Branch. This area at the time was mostly farm land owned principally by nineteen owners. However, two towns, Carrollsburg and Hamburg, had been established within the area. Carrollsburg was subdivided into streets and approximately 270 lots in 1770 and was bounded generally by the Eastern Branch, St. James Creek and by a line near what is now N Street, South. The lots were disposed of by lottery. Hamburg was located on the Potomac approximately between 18th. and 23rd. Streets, N.W. Obviously, the lot owners in Carrollsburg and Hamburg were in a different position than the owners of farm lands since the towns were established with streets and alleys dedicated for public use, while the owners of farm lands donated a portion of their lands for street purposes. Accordingly, the agreements differed in that the lot owners in Carrollsburg and Hamburg were to receive one-half the area of their lots with no allowance for streets.

Meanwhile, negotiations were had between the President, the Commissioners, and the principal owners of property within the district, looking to the establishment of the Federal City. By an agreement of March 30, 1791, proprietors of lots in Carrollsburg, including Daniel Carroll and Notley Young, agreed as follows:

"We, the subscribers holding or entitled to lots in Carrollsburgh, agree with each other and with the President of the United States that the lots and land we hold or are entitled to in Carrollsburgh shall be subject to be laid out at the pleasure of the President as part of the Federal City, and that we will receive one half of the quantity of our respective lots as near their present situation as may agree with the new plan, and where we may be entitled now to only one lot or otherwise not entitled on the new plan to one entire lot, or do not agree with the President, Commissioners or other person or persons acting on behalf of the public on an adjustment of our interest, we agree that there shall be a sale of the lots in which we may be interested respectively, and the produce thereof in money or securities shall be equally divided, one half as a donation for the use of the United States under the act of Congress, the other half to ourselves respectively. And we engage to make conveyances of our respective lots and lands aforesaid to trustees or otherwise whereby to relinquish our rights to the said lots and lands, as the President or such Commissioners or persons acting as aforesaid shall direct, to secure to the United States the donation intended by this agreement."

Similar agreements were entered into with the owners of lots in the Town of Hamburg. Agreements of similar effect were entered into with the owners of farm lands within the area of the proposed city, including Daniel Carroll and Notley Young, but these agreements provided that the proprietors would receive no compensation for streets to be laid out and that the President might retain any number of squares he might think proper for public use with payment to the owners at the rate of twenty-five pounds per acre. All of these agreements, it may be noted, provided for the equal division of building lots in the new city between the original proprietors and the public.

Subsequently, in pursuance of these agreements, proprietors of lots in Carrollsburg, including Daniel Carroll and Notley Young, executed deeds in trust to Thomas Beall and John Marshall Gantt, as Trustees, conveying their lands to be laid out for a Federal City "with such streets, squares, parcels, and lots as the President of the United States for the time being hath approved or shall approve." These lot owners were to have assigned and con-

veyed to them one-half the quantity of their original lots in "as near the old situations as may be" or failing this, to have satisfaction in other land in the City by agreement with the Commissioners, or in the event of a disagreement with the Commissioners, to have just compensation in money.

On December 19, 1791, an additional Act Md.Laws 1791, Ch. 45, D.C.Code 1940, P. XXVIII, was passed, ratifying the previous act of cession and making provisions facilitating the laying out of the Federal City. This Act and the supplemental Act of 1793, Md. Laws 1793, Ch. 58; D.C.Code 1940, P. XXXI, have an important bearing on the determination of the issues in this case, and therefore will be discussed in greater detail. The preamble of the Ratifying Act of 1791 recites that the President by Proclamation had located the District of Columbia; that Notley Young, Daniel Carroll and many other proprietors, including lot owners in Carrollsburg and Hamburg, had entered into agreements and executed deeds in trust subjecting their lands to be laid out anew as a city but that some of the proprietors "from imbecility and other causes" had not come into any agreement; and that it was deemed by the legislature just and expedient that all the lands within the proposed city should contribute, in due proportion, in the means which greatly enhanced the values of the whole. After these recitations, the Act ratifies the cession and relinquishes to the United States full and absolute right and jurisdiction "as well of soil as of persons" in the District, provided that rights of property of individuals in the soil should not be affected except by transfer by such individuals. Section 3 of the Act provides that all lands within the limits of Carrollsburg and Hamburg owned by the State or by persons under a variety of disabilities, including absence from the State, are subjected to the terms and conditions of the agreements and deeds in trust of Notley Young, Daniel Carroll and others, and that as to persons under disability or absent from the State, the Commissioners, after advertisement, might assign or allot the share of such proprietors as near the old situation as may be, in Carrollsburg and Hamburg.

Section 4 of the Act provides for the direct condemnation of the lands of any proprietor who within three months refused to convey his lands to the trustees on the terms and conditions of the deeds in trust executed by Notley Young, Daniel Carroll and others.

Section 12 of the Act empowers the Commissioners to license the building of wharves in the Potomac and Eastern Branch and that any wharf built without such license, shall be a common nuisance.

The supplemental Act of 1793 provides that certificates granted by the Commissioners to the purchasers of lots, with acknowledgment of the purchase money, and recorded shall be effectual to vest title in the purchasers without formal deed or conveyance. Section 3 of the Act provides that the Commissioners, after public advertisement, may proceed with the allotment and assignment of all lots in the city, as though the owner thereof resided out of the State, provided that if the owner should object in person or in writing, the Commissioners should proceed with condemnation of the objector's land as provided in the 1791 Act.

While these transactions were taking place between the Commissioners and the proprietors, and the aforementioned statutes were enacted, various maps and plans of the city were being prepared under direction of the President and the Commissioners. The first of these, the so-called L'Enfant Plan, while still incomplete, was presented to the President on August 19, 1791, and to Congress on December 13, 1791. The second, the Ellicott or Engraved Plan was completed and delivered to the President on February 20, 1792. Subsequently, apparently between the years 1795 and 1797, a third map, the so-called Tin Case Map, was completed by James R. Dermott. The Supreme Court has held that these several maps are to be taken together as representing the intentions of the founders of the City and so far as possible, are to be reconciled as parts of one scheme and plan; and that the Dermott Map itself was not a completed final map.

Nicholas King prepared a plan or serial map consisting of sixteen sheets in 1803 which the Supreme Court was of opinion in the Morris case, was a legitimate and important piece of evidence in determining the intention of the founders of the National Capital. The dates of preparation of these maps is important for, it will be noted, the agreements with the proprietors and some of the deeds in trust were executed prior to the completion of any map or plan of the proposed city. And, as has been stated, all lands in the proposed city were subjected to the terms and conditions of these agreements and deeds in trust by the Ratifying Act of 1791 and the supplemental Act of 1793.

Title to the Potomac River and its tributaries, including the Eastern Branch, and the soil thereunder below the natural ordinary high water mark, is vested in the United States for the benefit of the people. This principle is so well established in law in the District of Columbia that, it is submitted, it may be considered of the dignity of a rule of property. Morris v. United States, 174 U.S. 196, 227, 234, 246, 19 S.Ct. 649, 43 L.Ed. 946; United States v. Belt, 79 U.S.App.D.C. 87, 142 F.2d 761; United States ex rel. Greathouse v. Hurley, 61 App.D.C. 360, 63 F.2d 137, 140, affirmed United States ex rel. Greathouse v. Dern, 289 U.S. 352, 53 S.Ct. 614, 77 L.Ed. 1250; District of Columbia v. Cropley, 23 App. D.C. 232, 244; Smoot Sand & Gravel Corporation v. Washington Airport, 283 U.S. 348, 51 S.Ct. 474, 75 L.Ed. 1109; Marine Railway & Coal Co. v. United States, 257 U.S. 47, 42 S.Ct. 32, 66 L.Ed. 124. The unanimity of opinion of the highest courts in cases involving varying facts, and the unequivocal language of the decisions leaves no doubt, and little room for argument on this point.

In United States ex rel. Greathouse v. Dern, supra [289 U.S. 352, 53 S.Ct. 615], the most recent pronouncement of the Supreme Court on this subject, the completeness of the dominion and title of the United States of navigable waters in the District of Columbia was expressed as follows:

"Within this area Congress has the plenary power to control navigation which was vested in the United States before the cession and which it exercises generally over navigable waters within the several states. It also acquired by the cession proprietary powers over the lands lying under water, and under article 1, § 8, cl. 17, of the Constitution, granting exclusive legislative power over the District, the sovereign power to regulate and control their use for public purposes other than navigation."

The common law is controlling in this jurisdiction in the absence of some modification by statute or local decision. In Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 553, 38 L.Ed. 331, the Court stated:

"The common law of England upon this subject, at the time of the emigration of our ancestors, is the law of this country, except so far as it has been modified by the charters, constitutions, statutes, or usages of the several colonies and states, or by the constitution and laws of the United States."

That title to the bed of navigable rivers and the soil thereunder is vested in the sovereign has long been recognized in Maryland, from which the common law of the District is derived. Melvin v. Schlessinger, 138 Md. 337, 340, 113 A. 875; Day v. Day, 22 Md. 530, 537; Sollers v. Sollers, 77 Md. 148, 151, 26 A. 188, 20 L.R.A. 94, 39 Am.St.Rep. 404; Goodsell v. Lawson, 42 Md. 348, 362, 369 et seq.; Linthicum v. Shipley, 140 Md. 96, 116 A. 871, 23 A.L.R. 754. In Day v. Day, supra, the Court stated, 22 Md. at page 537:

"Rivers or streams within the ebb and flow of tide, to high water mark, belong to the public, and in that sense are navigable waters; all the land below high water mark, being as much a part of the jus publicum as the stream itself. The owners of adjacent ground had no exclusive right to such lands, nor could any exclusive right to their use be acquired, otherwise than by an express grant from the State."

A grant by the sovereign to the bed of a public waterway must be in express terms, and with the consent of the legislative department of the Government. Marine Railway & Coal Co. v. United

States, 49 App.D.C. 285, 265 F. 437, affirmed 257 U.S. 47, 42 S.Ct. 32, 66 L.Ed. 124; Shively v. Bowlby, supra.

The Commissioners were completely without authority to make any conveyance in derogation of the rights and title of the United States to the bed of the Branch below ordinary high water mark. District of Columbia v. Cropley, 23 App. D.C. 232.

The facts and the applicable law converge to show that by the cession to the United States the title to the soil under water below high water mark in the Eastern Branch was in the United States. It seems equally clear that the lots in Square East of Square 664 terminated at the high water mark of the Eastern Branch. The fee titles of the defendants are so limited.

The defendants, and their predecessors in title, took title to the high water mark of the Eastern Branch, and as a result became riparian owners with whatever rights and privileges that appertain to riparian property. United States v. Belt, supra. In considering the nature and extent of riparian rights it must first be observed that local law governs. Shively v. Bowlby, supra.

It is generally recognized that a riparian owner by reason of the adjacency of his land to the water has a natural right to the continued flow of the river in its natural state. Authorities agree that a riparian owner is entitled to accretion or reliction resulting from the gradual and imperceptible operation of natural causes, subject to erosion. The propositions as stated are not in dispute but a controversy exists as to the nature of the right of access from the land to the river and specifically the issue results as to whether or not the defendants and their predecessors in title have and had the right to fill in and wharf out below ordinary high water mark.

Early in the law of England every building or wharf erected without license below high water mark, where the soil is the King's is a purpresture, which could be demolished or seized at the suit of the King. It was an encroachment upon the property of the Sovereign. It was distinguished from a common nuisance that interfered with the rights of the public, as by interference with navigation. The distinction in law is that the sovereign may exercise discretion in causing the abatement of purprestures, but is under a duty to cause the abatement of common nuisances. See Shively v. Bowlby, supra. It would seem that the building of wharves in aid of commerce has been encouraged throughout the years. Indeed in § 12 of the Ratifying Act of December 19, 1791 supra, the Maryland Legislature authorized the Commissioners to license the building of wharves in the Potomac and Eastern Branch and provided that any wharf built without such license shall be a common nuisance. The case of United States v. Belt, supra, was brought under the same 1912 statute and is analogous to the instant case. There the court held that the allotees of lots formerly in Carrollsburg were entitled to riparian rights. The court said [79 U.S.App.D.C. 87, 142 F.2d 767]:

"So also there can be no manner of doubt that while the Carrollsburg proprietors of lots binding the highwater line of the Anacostia River continued to own such lots, they were entitled to the riparian rights appurtenant thereto, and that these rights were preserved and passed to the subsequent owners of these lots in the transaction we have referred to. Potomac Steam-Boat Co. v. Upper Pot. S. B. Co., supra, 109 U.S. [672], at page 686, 3 S. Ct. [445], at page 453, 27 A.L.R. 1070. The extent of the right is declared in Baltimore & O. R. Co. v. Chase, 43 Md. 23, to be the right to access to the navigable part of the River, with the right to make a landing, wharf, or pier, subject to such general rules and regulations as the State may think proper for the protection of the public. And in turn this right to regulation by the State of Maryland in the public interest, the United States succeeded to in the establishment of the District of Columbia, in consequence of which the common law rights of a riparian owner, within the limits of the District, are subject to change and modification by Act of Congress to the same extent and with the same limitations that change or modification might

have been made by Maryland while the land was within its boundaries. In addition, Congress under the commerce clause possesses a paramount power over the navigable waters of the United States in the regulation of commerce and navigation. As a result of these well recognized limitations or subordinations, the right of a riparian proprietor may be properly described as a qualified right (cf.: Greenleaf-Johnson Lbr. Co. v. Garrison, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939), though it is universally agreed that the right is property and that though it must be enjoyed in subjection to the rights of the public, it cannot arbitrarily be destroyed or impaired.

"But we have no need to discuss this question in detail in the facts of this case, since, as it happens, the United States have now established harbor lines in front of appellees' property and are not threatening to change or modify them * * *."

In the Potomac Steam-Boat case cited above, the Supreme Court held that the owners of Square No. 472 and Lot 13 in Square No. 504 did not have riparian rights because Water Street intervened between those properties and the Potomac River and the riparian rights attached to fast land adjacent to the River, in that case, Water Street itself. The court said [109 U.S. 672, 3 S.Ct. 451]: "The right of wharfage remained appurtenant to it."

It has often been held that riparian rights are valuable; that they are property; that the riparian owner has the right to preserve and improve his access to the navigable water. In *Baltimore* & O. R. Co. v. Chase, 43 Md. 23 the court said:

"These riparian rights founded on the common law are property and are valuable and while they must be enjoyed in due subjection to the rights of the public, they cannot be arbitrarily or capriciously destroyed or impaired. They are rights which once vested, the owner can only be deprived in accordance with the law of the land, and if necessary that they be taken for public use, upon due compensation."

An examination of the many decisions of state courts indicates the unanimity of judicial thought to the effect that one who has riparian rights may improve his access to the navigable waters as necessary to the full enjoyment of his property and a practical use thereof, and that he is privileged to fill in and build wharves.

Pursuant to the River and Harbor Act of March 3, 1899, 30 Stat. 1121, the Secretary of War established a Bulkhead line and a Pierhead line along the Anacostia River. These lines run in front of Square E. of 664. The bulkhead lines define the limit of solid fill without a permit and the pierhead lines define the limit of piers. There are no threatened or contemplated changes in the harbor lines in the area near the square.

It is generally held that the establishment of a harbor line operates as a license or invitation to fill or wharf out to that line. This legal principle is well stated in Dawson v. Broome, 24 R.I. 359, 53 A. 151, 155 wherein the court announced that:

"The establishment of a harbor line * * * means that riparian proprietors within the line are at liberty to fill and extend their land out to the line. A harbor line is in fact what it purports to be, the line of a harbor. It makes the boundary of a certain part of the public waters which is reserved for a harbor. The part so reserved is to be protected from encroachments. The rest is to be left to be filled and occupied by the riparian proprietors. Its establishment is equivalent to a legislative declaration that navigation will not be straitened or obstructed by any such filling out. * * * We think, however, it would be going too far to hold that the mere establishment of a harbor line conveys all within the line absolutely to the riparian proprietors. This would make all within the line private, and extinguish the public rights of navigation and fishery. We think the establishment of a harbor line, if it is to be construed as a conveyance, is to be construed as a conveyance which at least is subject to those rights, until they are excluded by filling or wharfing out. But it is not necessary for us to go even so far as that in the case at bar. It is enough for the respondents if we hold that the establishment of a harbor line operates

as a license or invitation to the riparian proprietor to fill or wharf out to that line."

Many State decisions announce the principle as stated and at the trial hereof an experienced, capable and expert witness testified that the administrative practice under the River and Harbors Act of 1899 is to consider that the establishment of the harbor lines on the Eastern Branch took the place of permission to fill to the bulkhead line and to build a pier to the pierhead line.

The defendants concede that the title to S Street is in the United States. It remains necessary to consider the contention of the parties with respect to South Capitol Street. This issue must be determined factually. The most persuasive evidence consists of the early maps. Two early engraved plans for the city, prepared by Andrew Ellicott, engraved about 1792 do not show Square East of 664. They do show South Capitol Street as terminating North of Square 664 at a street bounding the water. On June 15, 1795, the Commissioners directed James Dermott to prepare a plat of the city. President Washington and Thomas Pickering, Secretary of State, on March 2, 1797, directed a communication to Thomas Beall and John Gantt, Trustees under the deed of trust, to convey to the United States all streets in the city of Washington as they are laid out and delineated in the plan of the city which was annexed to the communication. The plan annexed was the Dermott or so-called Tin Case Map. The plan shows South Capitol Street as terminating at the North line of S Street above Square East of 664, and shows that South Capitol Street did not bound this square on the East nor cut off the riparian rights of lot owners. It also shows the North Boundary line of Square East of 664 as cutting off a part of South Capitol Street.

The Dermott plan is the official map of the city, as approved by the President. In the Morris case, 174 U.S. 256, 19 S.Ct. 649, 43 L.Ed. 946, it was held that the Dermott or Tin Case Map was the approved plan of the city. It is considered controlling as to the South Capitol Street issue. The decision in the Belt case, supra, supports this view and indicates that the Dermott plan controls when it is in conflict with plans shown in other maps. In that case the court said:

"Major Ellicott was succeeded by James Dermott after the Carrollsburg agreement. He was directed by the Commissioners to make a resurvey and plat of the lands within that town. This new layout he was directed to superimpose on the large plat to embrace when completed the entire area of the new City. This he did and his plat, with streets and squares and lots shown thereon, was adopted by the President and became the officially approved map of the City of Washington."

The conclusion is inescapable that the founders did not intend to extend South Capitol Street beyond the North line of S Street and that they had no thought of cutting off the riparian rights of the lot owners. It seems clear from the deeds in trust and from all relevant evidence that it was intended to lay out the part of the city which formerly was Carrollsburg in a manner which would preserve to the owners of Carrollsburg lots the riparian rights appurtenant to the lots which they had surrendered. It was the purpose that they should be allotted new lots fronting on the water with no street intervening between such lots and the navigable water. It must therefore follow that the ownership of the lots of the defendants is attended by riparian rights. These conclusions disprove plaintiff's contention that riparian rights are possessed by plaintiff at the termination of South Capitol Street.

The defendants have acquired ownership of and title to the land reclaimed by filling in below high water mark and landward of the bulkhead line. This results from a proper exercise of riparian rights by defendants and their predecessors in title. The title to such reclaimed land is one which may be encumbered or conveyed by the defendants and is subject to taxation by the taxing authorities. The defendants may not be deprived of their property therein except for public purposes and then only upon due process of law and with just compensation. Illinois Central R. Co. v. State of Illinois, 146 U.S. 387, 13 S. Ct. 110, 36 L.Ed. 1018; Dutton v. Strong,

1 Black 23, 66 U.S. 23, 17 L.Ed. 29; Louisville & Nashville R. Co. v. West Coast Naval Stores Co., 198 U.S. 483, 25 S.Ct. 745, 49 L.Ed. 1135; Weems Steamboat Co. of Baltimore City v. People's Steamboat Co., 214 U.S. 345, 29 S.Ct. 661, 53 L.Ed. 1024, 16 Ann.Cas. 1222; Nichols v. Lewis, 15 Conn. 137, 139. See also, Lockwood v. New York & New Haven R. Co., 37 Conn. 387, in which it is held that the principles governing owners of reclaimed land are the same as those governing the ownership of accreted land. Heiney v. Nolan, 75 N.J.L. 397, 67 A. 1008.

Controversy exists as to who must carry the burden of proof. The statute under which this case proceeds seems to place the burden of proof on the defendants. It is not an important question in view of the announcements herein, since the defendants have successfully born the burden.

The court will request a conference with counsel in the case with respect to the manner in which the Congressional mandate may be carried out in ascertaining the value of property rights possessed by the defendants and adverse to the claims of the United States.

Counsel for defendants will submit for settlement findings of fact, conclusions of law and a judgment form consistent herewith.