## MARINE RY. & COAL CO., Inc., v. UNITED STATES.

(Court of Appeals of District of Columbia. Submitted March 3, 1920. Decided April 5, 1920.)

### No. 3312.

1. States 13—Boundary between Maryland and Virginia fixed at high tide line on Virginia shore.

The boundary line between Maryland and Virginia was originally fixed by the Maryland charter of 1632, under the provisions of which Maryland embraced the Potomac River, the soil under it, and the islands therein to the high-water line of tide-water on the Virginia shore.

2. Boundaries 14—Grant of land running "down" a river held not to cover land in the river.

A grant of land on the west side of the Potomac river, described as beginning at a certain tree and extending "down" the river various courses to another tree, did not purport to convey land in the river proper.

3. Public lands 190—Virginia Governor in 1669 was without authority to grant title to soil under Potomac river vested in Maryland by charter.

The Governor of Virginia could not, by a grant made in 1669, give title to the soil under the Potomac river, which had been vested in the Maryland proprietary 37 years before by the charter of 1632.

4. District of Columbia 1—Compact between Maryland and Virginia for fixing boundary also fixes boundary of District.

If the compact of 1785 between Maryland and Virginia established the boundary between the two states at low-water mark, it likewise fixed the boundary of the District of Columbia as ceded by Maryland four years later, unless affected by the exercise of political jurisdiction by the United States, since whatever territory and right to the soil under the Potomac was ceded to the United States by Virginia was receded in 1846.

5. Public lands 193—In colonial grant, title to bed of river is in trust for nation, and subject to public use.

Under all of the grants along the Atlantic, including the Maryland grant to Lord Baltimore, the sovereign ownership of the bed of a navigable river within the ebb and flow of the tide belongs by virtue of the prerogative of sovereignty, and is held in trust for the nation and subject to public uses.

6. Navigable waters 36(1)—Ownership is in the states, subject to rights surrendered to national government.

By the Revolution all the rights of the crown and Parliament in the navigable waters and the soil under them became vested in the states, subject to the rights surrendered later to the national government by the commerce clauses of the Constitution.

7. Adverse possession 7(2)—Owners of fast lands on west side of Potomac could not acquire title to soil adverse to state or nation.

The owners of fast lands on the west side of the Potomac river, adjoining tidewater, could not, by virtue of their title thereto, acquire any title to the soil under the river adverse to that of the state of Maryland, or its successor in interest, the United States.

8. District of Columbia 1—Navigable waters 36(1)—Compact between Maryland and Virginia held not to affect jurisdiction over or nation's title to bed of Potomac.

The compact of 1785 between the states of Maryland and Virginia, providing for concurrent jurisdiction on the waters of the Potomac river, did not affect the jurisdiction over the bed of the river of the sovereignty to which it belonged, or the title which the United States, as successor of the state of Maryland, has in the soil beneath such river.

For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**9. Navigable waters ☞37(8)—Grant by Congress of power to common council of Alexandria as to navigation, wharves, etc., construed.**

Act Cong. May 13, 1826, § 2, giving the common council of the city of Alexandria power to preserve navigation, erect wharves, etc., extended only to the exercise of police jurisdiction over the harbor and harbor improvements, and was not a surrender by Congress of its supervision of commerce, even in such harbor, or a surrender of its title in the bed of the river.

**10. Navigable waters ☞39(4)—Riparian rights are subject to commercial necessity.**

Whatever rights a riparian owner on the banks of a navigable stream may have against individuals or the public, as represented by the government, must yield to commercial necessity for the improvement of navigation.

**11. Eminent domain ☞85—Navigable waters ☞44(3)—Riparian owner on improved river held not entitled to compensation or to soil reclaimed by filling.**

Where the government, in improving the Potomac river, built a riprap wall and filled in the river bed from the wall back to high-water mark on the Virginia shore, a riparian owner was not entitled to compensation by reason of the fact that its access to the river was cut off, and did not acquire title to the reclaimed soil below low-water mark, since, so long as the sovereign remains owner of submerged soil, it retains the fee of soil reclaimed.

**12. Ejectment ☞81—Plea of general issue by defendant in possession makes defense for whole land.**

Where the defendant in ejectment was found in possession of the land, its plea of the general issue must be construed as making defense for the whole of the land.

Appeal from the Supreme Court of the District of Columbia.

Action by the United States against the Marine Railway & Coal Company, Incorporated. From a judgment for the United States, defendant appeals. Affirmed.

James R. Caton, of Alexandria, Va., for appellant.
H. H. Glassie, of Washington, D. C., for the United States.

VAN ORSDEL, Associate Justice. The United States, plaintiff below, seeks by ejectment to recover possession of 60,984 square feet (1.4 acres) of land situated below and to the east of the high-water line of the Potomac river within a cove or indentation on the river bank at or adjacent to the city of Alexandria, Va., as the high-water line existed on the 1st day of January, 1911.

It appears that Congress, in the River and Harbor Act of June 25, 1910 (36 Stat. 630), made an appropriation for "improving Potomac river at Alexandria, Virginia, in accordance with the report submitted in House Document numbered twelve hundred and fifty-three." In the course of improving the river under direction of the Secretary of War, a riprap sea wall was constructed along the western edge of the channel below low-water mark between two points of land jutting into the river, known as Point Lumley and James Point. The wall thus constructed extended across the indentation called Battery Cove, embracing the land in controversy. In deepening the channel the material dredged from the bed of the river was deposited on the flat behind the

wall, filling the river bed from the wall back to the mean high-water mark on the Virginia shore. It also appears:

"That at the date of the commencement of the building of said riprap wall the average depth of water within the area aforesaid in front of the upland claimed to be owned by the defendant, the Marine Railway & Coal Company, Incorporated, was 1½ feet at mean low water, that the mean range of tide was 3 feet, and that there were, at that date, no existing structures of any kind extending from the defendant's upland beyond the mean high-water mark and within the area inclosed and reclaimed."

It also appears that the bed of the river within the limits of Battery Cove was all below low-water mark, except a narrow margin adjoining the river bank, between high- and low-water line, which was covered and exposed twice daily by the rising and receding tides.

When the area was filled, plaintiff caused a fence to be constructed along the former high-water line, on which notices were posted warning all persons that said land was government property and that trespassers would be prosecuted. Shortly thereafter defendant company destroyed the fence and took possession of the reclaimed land; hence this suit.

From a judgment in favor of plaintiff, defendant appeals.

[1] It is settled law that the boundary line between Maryland and Virginia was originally fixed by the charter granted by Charles I in 1632 to Lord Baltimore of the province of Maryland, embracing the Potomac river, the soil under it, and the islands therein to the high-water line of tidewater on the Virginia shore. Morris v. United States, 174 U. S. 196, 19 Sup. Ct. 649, 43 L. Ed. 946; Maryland v. West Virginia, 217 U. S. 1, 46, 30 Sup. Ct. 268, 54 L. Ed. 645; Alexandria Canal Co. v. District of Columbia, 1 Mackey (12 D. C.) 217. It was held that the title thus granted to Lord Baltimore was not divested by any valid proceedings prior to the Revolution, nor affected by the prior grants by James I to the Colony of Virginia, or the subsequent grant to Lord Culpepper of the territory between the Potomac and the Rappahannock rivers, commonly called the "Northern Neck of Virginia."

[2, 3] Defendant, presumably for the purpose of establishing later rights by prescription, relies upon a grant to one Robert Howsing on October 21, 1669, by Sir William Berkeley, Governor of Virginia, of—

"6,000 acres of land situated upon the freshes of the Potomac river on the west side thereof above the dividing branches of the same, beginning at a red oak standing by a small branch or run of water near opposite to a small island commonly called and known by the name of My Lord's Island, extending down the Potomac river various courses 3,152 poles, making a southwesterly line to a pokecory standing at the north point of a creek named by the English Indian Cabin creek, which creek divides this land and the tract of land surveyed by John Matthews, from the said pokecory northwest and by west by the said creek and main branch 520 poles; from thence north 940 poles; finally east 720 poles to the red oak begun at, including several small creeks and inlets, for the said quantity of land."

The effect of this grant upon the present controversy may be disposed of by reference to the patent, which does not purport to convey land in the river proper. The river boundary starts at a point on the land, and extends down the river, not by a straight line, but by "various courses" in a southwest line to another point on the land. Nor

could the Governor of Virginia grant to Howsing title to soil under the river which 37 years before had been vested in the Maryland proprietary.

On March 28, 1785, a compact was entered into by Virginia and Maryland, which among other things, provides:

"Sixth. The river Patowmack shall be considered as a common highway for the purpose of navigation and commerce to the citizens of Virginia and Maryland, and of the United States, and to all other persons in amity with the said states trading to or from Virginia or Maryland."

"Seventh. The citizens of each state respectively shall have full property in the shores of the Patowmack river adjoining their lands, with all emoluments and advantages thereunto belonging, and the privilege of making and carrying out wharves and other improvements so as not to obstruct or injure the navigation of the river," etc.

This compact, considered as a whole, seems not to have related to the question of boundary, but to the establishment of a system whereby the two states and the citizens thereof could amicably use and police the waters of the Chesapeake Bay and the Potomac and Pocomoke rivers. The subject-matter of the agreement was use and jurisdiction, not sovereignty. While it is stated in the compact that the boundary on the Chesapeake and Pocomoke is doubtful, no attempt was made to adjust it, and nothing whatever is said as to the boundary on the Potomac.

By repeated decisions of the courts of this District, it has been held that the jurisdiction of the United States within the District of Columbia extends over the Potomac river to the line of high water on the Virginia shore. Alexandria Canal Co. v. District of Columbia, supra; Smoot v. District of Columbia, 23 App. D. C. 266, 271; Evans v. United States, 31 App. D. C. 544; Jefferson v. District of Columbia, 40 App. D. C. 381, 383. In the Alexandria Canal Co. Case, the court sustained the power of the District to assess and collect taxes upon the Aqueduct Bridge up to the high-water line on the Virginia shore. In the Smoot and Jefferson Cases, it was held that the police power as exercised by the District extends over the entire river. In the Evans Case the authority of the District to arrest and prosecute persons fishing in the waters of the Potomac from the Virginia shore was sustained.

The holding in these cases is grounded in no small degree upon the theory that Congress has politically determined the territorial limits of the District of Columbia. In the first section of the Revised Statutes of the United States affecting the District of Columbia, approved June 22, 1874, Congress defined the District to be:

"That portion of the territory of the United States ceded by the state of Maryland for the permanent seat of government of the United States, including the river Potomac in its course through the District and the islands therein."

Thus is appears that, not only has Congress legislated upon the basis that the entire river is embraced within the District, but the record shows that the municipal corporation, as the executive agency of the government for the enforcement of police power, has claimed and exercised, and still claims and exercises, jurisdiction to the high-

water mark on the Virginia side. This, it would seem, constitutes a political determination of the territorial limits, binding upon the courts of this jurisdiction. As was said in State v. Dunwell, 3 R. I. 127, 128:

"This exception assumes to bring in question the eastern boundary line of this state. Where that line is, de jure, is a political question, with which the courts of the state will not intermeddle. Sufficient for them is it that the state has always claimed jurisdiction up to and 'along the easterly side or bank' of the Seckonk river, and exercised it in fact. The courts are bound to take cognizance of the boundaries in fact claimed by the state."

[4] In the recent case of Maryland v. West Virginia, 217 U. S. 577, 30 Sup. Ct. 630, 54 L. Ed. 888, the court, considering the award of 1878, by which the boundary between the states of Maryland and Virginia was fixed at the low-water line on the Virginia shore, held, in effect, that this line had been established by the compact of 1785. The United States was not a party to the award of 1878, and her status with respect to the boundary between the District of Columbia and Virginia was not involved. However, as we interpret the opinion, it holds that the boundary was established at low-water mark by the compact of 1785, and, unless affected by the exercise of political jurisdiction by the United States, it likewise fixes the boundary of the District of Columbia as ceded by Maryland in 1789, four years after the compact, since whatever territory and right to the soil under the Potomac was ceded to the United States by Virginia in 1789 was receded in 1846.

[5-7] Coming, now, to the rights attempted to be asserted by the defendant company in this case, they are inconsistent with the very nature of title to the bed of navigable waters. The title of Maryland in the soil below tidewater in the Potomac was established upon too firm a foundation to be shaken by private land grants upon the Virginia shore. The sovereign ownership of the bed of a navigable river within the ebb and flow of the tide belongs by virtue of the prerogative of sovereignty and is held in trust for the nation and subject to public uses. Such was the nature of all the grants along the Atlantic, including the grant to Lord Baltimore. As said in the Morris Case:

"The various charters granted by different monarchs of the Stuart dynasty for large tracts of territory on the Atlantic coast conveyed to the grantees both the territory described and the powers of government, including the property and the dominion of lands under tidewaters."

And in the same case the court held that the title in the crown to the soil under navigable waters is held in trust for the use of the whole community, "and not as private property, to be parceled out and sold for his own individual emolument." With the American Revolution, all the rights of the crown and Parliament in the navigable waters and the soil under them became vested in the states, subject to the rights surrendered later to the national government by the commerce clauses of the Constitution. So sacred is this trust that it has been universally held, not only that a grant of the sovereign to the bed of a public waterway must be in express terms, but it must be with the consent of the legislative department of the government. Martin v. Waddell, 16 Pet. 367, 410, 10 L. Ed. 997. It is therefore inconsistent with every prin-

ciple upon which the title to the soil under public waterways is protected to hold that defendant, or its predecessors in interest, by virtue of their title in the fast lands adjoining tidewater acquired any title adverse to that of the state of Maryland or its successor in interest, the United States.

[8] Nor is the contention of counsel for defendant more tenable on the question of jurisdiction, either as to the corporation of the city of Alexandria or the state of Virginia over the bed of the Potomac river. By the compact of 1785 concurrent jurisdiction on the waters of the Potomac was established between the two sovereignties of Maryland and Virginia. Such compacts are common in this country over the waters of navigable streams. But as to the bed of the river the jurisdiction in the sovereignty to which it belongs is not thereby affected. As was said in the case of Wedding v. Meyler, 192 U. S. 573, 584, 24 Sup. Ct. 322, 324 (48 L. Ed. 570, 66 L. R. A. 833), where the court was considering the effect of a similar compact between the state of Kentucky and the state of Indiana affecting the waters of the Ohio:

"What the Virginia compact most certainly conferred on the states north of the Ohio was the right to administer the law below low-water mark on the river, and, as part of that right, the right to serve process there with effect. State v. Mullen, 35 Iowa, 199, 205, 206. What more jurisdiction, as used in the statute, may embrace, or what law or laws properly would determine the civil or criminal effect of acts done upon the river, we have no occasion to decide in this case. But so far as applicable we adopt the statement of Chief Justice Robertson in Arnold v. Shields, 5 Dana [Ky.] 18, 22 [30 Am. Dec. 669]: 'Jurisdiction, unqualified, being, as it is, the sovereign authority to make, decide on, and execute laws, a concurrence of jurisdiction, therefore, must entitle Indiana to as much power, legislative, judiciary, and executive, as that possessed by Kentucky, over so much of the Ohio river as flows between them.' The conveniences and inconveniences of concurrent jurisdiction, both are obvious, and do not need to be stated. We have nothing to do with them when the lawmaking power has spoken. To avoid misunderstanding it may be well to add that the concurrent jurisdiction given is jurisdiction 'on' the river, and does not extend to permanent structures attached to the river bed and within the boundary of one or the other state."

A similar rule has been announced in Central R. Co. v. Jersey City, 209 U. S. 473, 28 Sup. Ct. 592, 52 L. Ed. 896; Nielsen v. Oregon, 212 U. S. 315, 29 Sup. Ct. 383, 53 L. Ed. 528; McGowan v. Columbia River Packers' Ass'n, 245 U. S. 352, 38 Sup. Ct. 129, 62 L. Ed. 342; Nicoulin v. O'Brien, 248 U. S. 113, 39 Sup. Ct. 23, 63 L. Ed. 155.

The compact of 1785 between Maryland and Virginia fundamentally dealt with the matter of the exercise of concurrent jurisdiction over the waters of the Potomac. Hence, whatever be the right of the state of Virginia, or its executive agency, the municipal corporation of Alexandria, not parties to this controversy, to exercise criminal and civil jurisdiction over the waters of the Potomac, such jurisdiction can in no way affect the title which the United States, as the successor of Maryland, has in the soil beneath the Potomac river.

[9] Nor is this affected by section 2 of the act of Congress of 1826 (4 Stat. 163), which, among other things, provides that the common council of Alexandria— °

"shall have power to preserve the navigation of the Potomac river, within their jurisdiction, to erect, repair, and regulate public wharves, deepen docks and basins, and to limit the extension of private wharves, into the harbor."

This extended only to the exercise of police jurisdiction over the harbor and harbor improvements, and did not amount to a surrender by Congress of its supervision of commerce, even in the harbor of Alexandria, or to the surrender of the title of the United States in the bed of the river.

Nor is it important, as appears from the record, that by filling in the Potomac front adjacent to the city of Alexandria there has been added to the fast lands many blocks of ground which are occupied by the citizens of Virginia and on which the municipality and the state are collecting taxes. It is unnecessary to consider these matters, or what, if any, prescriptive rights may have accrued by adverse possession, since, as to Battery Cove—the property in question—no such condition or occupation at any time existed prior to the date when the government improvements were authorized in 1911.

[10] Defendant's contention, based upon the doctrine of riparian rights, is likewise untenable. Whatever rights a riparian owner on the banks of a navigable stream may have against individuals, or the unorganized public, or even the general public, as represented by the government, must yield to commercial necessity. Greenleaf Lumber Co. v. Garrison, 237 U. S. 251, 35 Sup. Ct. 551, 59 L. Ed. 939. The basis of the rule is clearly stated in Sage v. Mayor, 154 N. Y. 61, 79, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592, and quoted with approval in Scranton v. Wheeler, 179 U. S. 141, 162, 21 Sup. Ct. 48, 56 (45 L. Ed. 126), as follows:

"I think that the rule rests upon the principle of implied reservation, and that in every grant of lands bounded by navigable waters where the tide ebbs and flows, made by the crown or the state as trustee for the public, there is reserved by implication the right to so improve the water front as to aid navigation for the benefit of the general public, without compensation to the riparian owner. The implication springs from the title to the tideway, the nature of the subject of the grant and its relation to navigable tidewater, which has been aptly called the highway of the world. The common law recognizes navigation as an interest of paramount importance to the public."

[11] Not only is defendant deprived of the right of compensation by reason of having its access to the river cut off, but its title to the reclaimed soil below low-water mark stands upon no better foundation. No right is asserted by virtue of any grant by the sovereign of title to the bed of the river below low-water mark within the reclaimed limits, or of occupation by wharfage or otherwise. For aught that the record discloses, this cove, at the time the government work began, was in the same condition as when granted by Lord Baltimore. A similar question arose in Morris v. United States, supra, wherein the title to certain reclaimed lands in the Potomac flats in the city of Washington was involved. It was held that, in the absence of a special grant by Congress of the bed of the river, which in the improvement of navigation had been reclaimed, the title to the reclaimed land remained in the United States. The rule is without exception that, so long as the sovereign remains owner of submerged soil, it retains the fee of the soil

reclaimed. Barney v. Keokuk, 94 U. S. 324, 24 L. Ed. 224; Hoboken v. Penna. R. Co., 124 U. S. 656, 8 Sup. Ct. 643, 31 L. Ed. 543; Illinois Central R. Co. v. Illinois, 146 U. S. 387, 13 Sup. Ct. 110, 36 L. Ed. 1018.

[12] Whatever view be taken of the West Virginia Case, the judgment must be affirmed. Appellant pleaded nothing but the general issue, and was found in possession of the land demanded. His pleading, therefore, must be construed as making defense for the whole. Greer v. Mezes, 24 How. 268, 277, 16 L. Ed. 661.

Affirmed.