UNITED STATES ex rel. GREATHOUSE et al. v. HURLEY, Secretary of War, et al.[*]

No. 5692.

Court of Appeals of the District of Columbia.

Argued Dec. 5, 1932.

Decided Jan. 16, 1933.

*Judgment affirmed 53 S. Ct. 614, 77 L. Ed. ——.

Leo A. Rover, John W. Fihelly, Seth W. Richardson, and Gustave A. Iverson, all of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

VAN ORSDEL, Associate Justice.

This appeal is from a judgment of the Supreme Court of the District of Columbia denying a writ of mandamus to compel the Secretary of War to issue a permit for the construction of a wharf in the Potomac river on the Virginia shore, and within the limits of the District of Columbia. The permit was sought under the provisions of the Rivers and Harbors Appropriation Act of March 3, 1899, § 10, 30 Stat. 1151 (33 USCA § 403), as follows: "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to beginning the same."

It is conceded that the wharf here sought to be constructed is not within the limits of any established harbor line. It likewise appears that the plans were approved and recommended by the Chief of Engineers and disallowed by the Secretary of War upon the stated ground that the allowance of the permit would be against public policy.

Appellants insist that by the terms of section 7 of the compact of 1785 between Maryland and Virginia they acquired such property rights in the waters of the Potomac on the Virginia shore as entitles them, as a matter of right, to a permit at the hands of the Secretary of War. Under this contention we are again confronted with the compact of

GRONER and HITZ, Associate Justices, dissenting.

---

Chester I. Long, S. W. McIntosh, and Spencer Gordon, all of Washington, D. C., for appellants.

1785 between Maryland and Virginia, relating to the mutual use of the waters of the Potomac river, and whether or not this compact is in force in the District of Columbia. It has been decided so frequently by the courts that it is not in force in the District of Columbia as to almost render the question moot. Evans v. United States, 31 App. D. C. 544; Herald v. United States, 52 App. D. C. 147, 284 F. 927; Marine Railway Company v. United States, 49 App. D. C. 285, 265 F. 437; Id., 257 U. S. 47, 42 S. Ct. 32, 34, 66 L. Ed. 124; Smoot Sand & Gravel Corporation v. Washington Airport, 283 U. S. 348, 51 S. Ct. 474, 75 L. Ed. 1109.

The Smoot Case, among other things, finally fixed the boundary line between Virginia and the District of Columbia at the high-water mark on the Virginia shore. In the Marine Railway Co. Case, the court, referring to the compact of 1785, said: "Without going into the history of the compact or reciting it, we only need to remark that it was a regulation of commerce, and while with a view to opening up a route to the West it provided in Article 6 that the Potomac should be considered as a common highway for the purposes of navigation and commerce to the citizens of Virginia and Maryland, and in Article 7 gave the citizens of each State full property in the shores of the river adjoining their lands and the privilege of carrying out wharves, etc., with a common right of fishing, it left the question of boundary open to long continued disputes. It may be laid on one side even if it ever was in force in the District of Columbia, which has been denied on the ground that the compact was abrogated so far as it affected this land by the grant of Virginia and was not revived by the grant of the United States. Evans v. United States, 31 App. D. C. 544, 550. See Georgetown v. Alexandria Canal Co., 12 Pet. 91, 9 L. Ed. 1012."

In the Evans Case, above cited, with approval on the point that the compact was abrogated so far as it affected the District of Columbia by the grant of Virginia and was not revived by the grant of the United States back to Virginia, we said: "The easements and privileges she possessed in the river, under the compact, were destroyed by the cession to the United States, and, having been lost, they could not be revived by the mere reconveyance of the territory ceded, unless expressly recreated in the act of retrocession. Regarding the easements and privileges granted in the compact, the act of retrocession is silent. There being no express re-

vival, there could be no revival by implication."

Inasmuch as the compact was made between Virginia and Maryland acting in their character as states, the citizens of these commonwealths were not parties to the compact, and it remained within the power of the states, which established whatever rights inured to the citizens of either, to annul or modify the compact at will, consequently the exercise of sovereign authority over the compact, belonging to the states of Maryland and Virginia, passed to the United States with the cession to form the territory of the District of Columbia. Georgetown v. Alexandria Canal Company, supra.

With the cession there was a complete change of sovereignties. The United States superseded that of the states of Maryland and Virginia, and until it recognized the easements and privileges accorded the citizens of Virginia by the seventh paragraph of the compact, the compact became and remained inoperative within the District. Congress has never recognized in any respect the compact, or any rights under it. On the contrary it has by express legislation assumed absolute and complete jurisdiction and control over the Potomac river within the District to the high-water mark on the Virginia shore.

Article 7 of the compact provides as follows: "The citizens of each State, respectively, shall have full property in the shores of the Potowmack River adjoining their lands, with all emoluments and advantages thereunto belonging, and the privilege of making and carrying out wharves and other improvements, so as not to obstruct or injure the navigation of the river." It will be observed that the right to occupy the stream with wharves or other improvements is treated in the compact as merely a privilege in the nature of an easement that may be continued or destroyed by the joint action of the states at will. A riparian right only rises to the dignity of a vested property right in the stream when the title of the riparian proprietor extends to the bed of the stream. In that case the riparian right clearly is not an easement, as one cannot have an easement upon his own land. The same would be true of navigable streams where the state has extended the rights of the riparian owner beyond the border of the stream. But this rule has no application here. The compact did not change the line between the states of Maryland and Virginia. It continued at high-water mark; hence the "full property

in the shores," mentioned in article 7, were not property rights in the sense that they vested a riparian owner with seisin or title to the bed of the river below high-water mark. The fee of the riparian owner in this instance stopped at the water's edge.

If the compact created in the citizens of Virginia a vested property right in the river, the authority of the states could not be exercised to its destruction without due compensation. But as we have observed, the privilege thus granted was subject to the will of the sovereignties of Maryland and Virginia as long as Maryland retained the title to the bed of the river and Virginia possessed merely the commercial rights granted under the compact; but when these sovereignties surrendered the territory composing the District of Columbia to the United States, all those rights and privileges passed to the new sovereign and were subject to its will and control, and until recognized by the United States they were extinguished. Not having been recognized, the act of recession to Virginia did not revive them.

It is urged by counsel for appellants that the Maryland Act of March 12, 1786,[1] by which the compact was ratified, has not been repealed and became a law of the District under the organic act of 1801 (2 Stat. 103), D. C. Code 1924, § 1636, continuing the laws of Maryland in force in the District of Columbia. The Maryland act merely imparted legal force to the compact, and since the compact, as ratified, never was in force in the District, the act of ratification never became a part of the law of the District.

[2] It seems to be conceded by counsel for appellant in this case that there is no vested property right in the river, since they endeavor to attach to their clients the rights accorded under the compact on the basis of riparian ownership. Nothing is better settled than the common-law rule that "the title and the dominion in lands flowed by the tide were in the King for the benefit of the Nation. Upon the settlement of the Colonies, like rights passed to the grantees in the royal charters, in trust for the communities to be established." Shively v. Bowlby, 152 U. S. 1, 57, 14 S. Ct. 548, 38 L. Ed. 331. This right of dominion and control by the sovereignty extends to the states and in the District of Columbia to the United States. It is, of course within the sovereign power to regulate and control the shores of tidewaters and the land under them as was exercised by the Crown of England. "The state may even dispose of the usufruct of

such lands, as is frequently done by leasing oyster beds in them, and granting fisheries in particular localities; also, by the reclamation of submerged flats, and the erection of wharves and piers, and other adventitious aids of commerce." Shively v. Bowlby, supra, 152 U. S. 46, 14 S. Ct. 548, 565, 38 L. Ed. 331.

Assuming, as we must, that the provision of the Rivers and Harbors Act, above quoted, applies to the Potomac river within the District of Columbia, as to all other navigable waters of the United States, the only way that a riparian owner of land bordering upon the Potomac river can acquire a wharfage right is through a permit issued by the Secretary of War. Congress has conferred its unlimited discretionary jurisdiction in this particular to the Secretary of War, and in granting these permits he exercises the power that might otherwise be exercised by the sovereign. This brings us to the important point for consideration in this case, and upon which, regardless of the compact of 1785, we think the case turns; the discretionary power of the Secretary of War in refusing this permit.

To entitle appellants to a permit, it must clearly appear in this proceeding, not only that a positive ministerial duty is imposed upon the Secretary of War to issue the permit, but it must also appear that the appellants have a clear and unquestionable right to compel the performance of that duty by the Secretary. Appellants in their petition, among other things, allege: "That on the 24th day of June, 1929, Charles H. Greathouse was the owner of the property described in paragraph 3 hereof, and on that date he entered into an agreement to sell said real estate to the Sun Oil Company, said sale being contingent upon the granting of permission to erect tanks, warehouses, and other equipment thereon, and the construction of requisite wharfs, piers, pipe lines, and moorings out from and in front of said property into and in the Potomac River for the loading and unloading of tanks, barges, and other light vessels; that under the terms of said agreement application for such permission could be made by the said Charles H. Greathouse at his option either in his own name or in the name of the Sun Oil Company."

It appears that the application for permit was originally made in 1929 by the Sun Oil Company in its own name, and with the positive assertion of ownership of the property in question. It appearing upon investi-

[1] Laws Md. 1876, c. 1.

gation that the Sun Oil Company was not the owner of the property, but that its only interest arose out of the above contract, the Secretary of War refused the permit on October 15, 1930. So far as the record shows, the Sun Oil Company at this point dropped out of the controversy.

It is further alleged in the petition: "That on, to wit, April 29, 1930, the said Charles H. Greathouse conveyed the real estate herein described, and all rights under the agreement and application above referred to, to these plaintiffs. That on the 9th day of May, 1930, while said application was pending before the Chief of Engineers, plaintiffs entered into an agreement with the Sun Oil Company for the sale of said lands containing the same provisions as those in the contract of Charles H. Greathouse, hereinbefore described. Plaintiffs, under the terms of said agreement, and as owners of said real property, are entitled to all benefits and inchoate rights resulting from the° efforts of the Sun Oil Company to obtain permits for such construction."

Appellants now contend that they have the right to take up the case·where the Sun Oil Company left off, and that under the original contract they fall heir to all "benefits and inchoate rights" which the Sun Oil Company may have acquired. It is clear, therefore, that the present appellants are not the real parties in interest. They have no intention of constructing a wharf. Their interest and only interest asserted in this appeal is to secure a permit to enable them to sell their land. In the last analysis the permit is sought to promote a real estate speculation which at most amounts to a mere contingent expectancy° that may or may not materialize. Appellants are not seeking to build a wharf for themselves, nor to obtain a permit for themselves. The permit is for the Sun Oil Company. The contract provides, in substance, that if the permit given by the Arlington county officials for the erection of storage tanks on the upland is continued, and if the Secretary of War grants the permit for the erection of the wharf, then, and in that event, the Sun Oil Company will purchase the property.

It will be observed that these matters are conditional, contingent, prospective, and inchoate. It is elementary that the writ of mandamus will only issue for the enforcement of a right which is complete, and not merely an inchoate right. High on Extraordinary Legal Remedies, § 10. In 38 Corpus Juris, page 586, § 57, it is said: "Mandamus will not issue to enforce a right which is conditional or incomplete by reason of conditions precedent which are still to be performed by the petitioner or the relator or which is contingent upon the further act of a third person or tribunal."

Section 10 of the Rivers and Harbors Act, giving the Secretary of War power to authorize the erection of wharves in the navigable waters of the United States, is twofold. It forbids the issuance of a permit where the structure will interfere with navigation. In this aspect the Secretary has no discretion, except to determine whether such interference exists. On the other hand, the act confers discretion in the Secretary to grant or refuse permits where the structure will not interfere with navigation, and the Secretary in the exercise of that discretion may take into consideration the character of the structure sought to be built in any port or "where no harbor lines have been established," and in the determination of this matter the Secretary must take into consideration the "location" and the "condition" of the structure and its effect upon other structures or upon the "channel," or the normal flow of the stream. The Secretary may well have concluded that the structure of the wharf in question, a short distance above a bridge costing millions of dollars, would so alter or modify the course of the stream as to result in damage to the bridge. The Secretary is not required to state the specific grounds upon which his discretion is exercised, providing he is acting, as in this case, in a discretionary capacity. Discretionary power is jurisdictional, and the court, in determining whether or not the decision of an official of the government was within his discretion, will be guided not alone by the specific ground upon which the decision is based, but broadly by an examination of the entire record in order to ascertain whether or not the action taken can be reconciled with the law conferring jurisdiction.

The "condition" that seems to have impelled the action of the Secretary in denying the permit grew out of the Act of Congress of June 6, 1924, 43 Stat. 463 (see 40 USCA §§ 71–73), providing for the creation of a National Capital Park Commission, and the Act of May 29, 1930, 46 Stat. 482, known as the Cramton Act, authorizing the development and completion of the George Washington Memorial Parkway. The court below in its opinion, in commenting upon the effect

142

of these acts, said: "By the Act of May 29, 1930, Congress authorized the development and completion of the George Washington Memorial Parkway, which, as we have pointed out, was to include the shore of the Potomac and adjacent lands from Mount Vernon to a point above the Great Falls on the Virginia side, and specifically authorized the National Capital Park & Planning Commission, of which the defendant, Lytle Brown, as Chief of the Engineers of the Army, was a member, to occupy such lands belonging to the United States as may be necessary for the development and protection of said parkway. This certainly prohibits the use and occupancy of the shores of the Potomac River within the District of Columbia for any other purpose. It is conceded that this parkway will pass over and along the shores of the Potomac River in front of relator's property. The proposed wharf, if constructed, will necessarily have to be removed before the parkway can be extended over and along that point. This is the situation that confronted the Secretary of War when he was called upon to grant permission for the construction of the wharf."

Appellants in their petition lay claim to the ownership of a strip of land on the Virginia shore between the high-water marks of 1863 and 1931, where gradual accretions have from time to time extended the shore line into the river, and that the land created by the accretions was conveyed to them by their predecessors in title. Defendant, Secretary of War, in his answer alleges: "Further answering the petition, by way of a separate and distinct answer thereto, respondent states that he is informed and believes and therefore avers that the United States is the owner in fee of the south bank of the Potomac River within the limits of the District of Columbia to the high-water mark of 1792 of the Potomac River."

The National Capital Park Commission on September 25, 1931, pursuant to the Cramton Act, took action in relation to the claim of the United States to the ownership in fee of the land created by accretion on the Virginia shore by the following resolution: "This commission, therefore, in accordance with authority granted it by Congress, does hereby take possession of, and occupy, the said lands hereinafter described by actual survey, which will include to center line of channel of the Potomac River in the District of Columbia, for the various purposes and intents as set forth in the said act of Congress, and that such possession and occupation thus referred to be complete and exclu-

sive, and that a copy hereof be posted upon each of the group parcels of land hereinafter described."

The lands claimed by accretion lying between the present high-water line of the river and that of 1792 are included in the lands described in the above resolution. It was conceded in the argument in this court that notices had been posted upon the lands, and that action has been taken in the Supreme Court of the District of Columbia to determine the title to these lands. In this situation it would seem that the issuance of a permit to construct the wharf would be an act of folly, for the reason that, if it is found ultimately that the government is not the owner of the land immediately adjacent to the river, provision has been made for its condemnation and ample funds appropriated under the Parking Act to acquire the lands adjacent to the river for parking purposes.

Clearly appellants have established nothing in the development of their case upon which a legal right to the writ of mandamus can be predicated, and there is nothing in the statute which reduces the duty imposed upon the Secretary to a mere ministerial act. The denial of the permit on the ground of public policy is, we think, fully supported by the record in this case.

The judgment is affirmed.

GRONER, Associate Justice (dissenting).

I cannot concur in the opinion of the court in this case. The appeal is from a decision of the lower court denying a writ of mandamus to compel the Secretary of War to issue a permit for the construction of a wharf in the Potomac river on the Virginia shore in front of the lands owned in fee simple by appellants. The permit was applied for under act March 3, 1899, § 10 (USCA, tit. 33, ch. 9, § 403, p. 397). The act will be found copied in full in the opinion of the majority.

The Chief of Engineers, after hearing and examination of the plans and specifications, decided that the proposed structure would not obstruct navigation in the waters of the Potomac river and recommended the granting of the permit. The Secretary of War, though admitting that the proposed wharf would not obstruct navigation, declined to grant the permit on the sole ground that the construction of the wharf might interfere with the plans of the commission appointed under the provisions of the act of Congress of May 29, 1930, known as the

Cramton Act (46 Stat. ch. 354, p. 482), in the subsequent establishment of the proposed George Washington Memorial Parkway along the Potomac to Mount Vernon and above Washington to Great Falls. On the other hand, appellants insist that as the owner of a part of the bank of the river on the Virginia side, they have, under the compact of 1785, the right to build a wharf, subject only to the condition that the same is not detrimental to the public interest in the navigation of the river.

The compact of 1785 was entered into between commissioners appointed by Maryland and Virginia. In its broader aspects it was a regulation of commerce with a view to opening up a route to the West. It provided that the Potomac should be considered as a common highway to the citizens of both states for the purpose of navigation and commerce. Marine Ry. & Coal Co. v. United States, 257 U. S. 47, 42 S. Ct. 32, 66 L. Ed. 124. It did more than this, however, for it fixed the respective property rights of the owners of land along the river on either side to the use and enjoyment thereof as follows: "Seventh, The citizens of each State, respectively, shall have full property in the shores of Potowmack River adjoining their lands, with all emoluments and advantages thereunto belonging, and the privilege of making and carrying out wharves and other improvements, so as not to obstruct or injure the navigation of the river. * * * "

The compact was duly ratified by each commonwealth. 1 Dorsey, Md. Laws, 1692–1837, p. 187; 12 Hening, Va. Stat. p. 500. And the rights thus secured, the two commonwealths, by act of general assembly of each, solemnly pledged their faith should never be repealed or altered without the consent of the other. In 1789 and 1791, respectively, Virginia and Maryland ceded to the United States the territory which became the District of Columbia. In each act of cession (Burch's Digest, p. 213; Md. Act 1791, ch. 45) there was a proviso as follows: "Nothing herein contained shall be construed to vest in the United States any right of property in the soil, or to affect the rights of individuals therein, otherwise than the same shall or may be transferred by such individuals to the United States."

In 1846 there was a recession to Virginia of the territory ceded by her to the United States, and this act (9 Stat. 35, ch. 35, § 1) provided: "* * * All the rights and jurisdiction therewith ceded over the same, be, and the same are hereby, ceded and forever relinquished to the State of Virginia, in full and absolute right and jurisdiction, as well of soil as of persons residing or to reside thereon. * * * "

We have, therefore, here a case in which the owner of land formerly in Virginia, then in the District of Columbia, and by recession now in Virginia, binding on the Potomac river, and which by accretions has been extended from its original shore line out into the river beyond the original high-water line, claims the right, under the compact, of access to the navigable part of the river and the right to the use of the soil under the river between his land and the line of navigability whereon to erect a wharf.

Since the answer depends on the rights granted under the compact, it is unnecessary to refer to established principles with relation to the rights ordinarily of a riparian owner on a navigable waterway, except to note that both in Maryland and in Virginia from early colonial times the right to wharf out has always been recognized as an incident of such ownership. See McCready v. Virginia, 94 U. S. 391, 24 L. Ed. 248; Shively v. Bowlby, 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331; Groner v. Foster, 94 Va. 650, 27 S. E. 493, and U. S. v. Chandler-Dunbar Water Power Co., 229 U. S. 53, 33 S. Ct. 667, 57 L. Ed. 1063. If, therefore, the effect of the compact between Virginia and Maryland was to create a property right or even a franchise in the owners of lands on the Virginia side binding on the Potomac river to have access to the channel line for the building of wharves, and if such right was not affected by the cession or recession (as the Supreme Court in terms has declared it was not, Marine Ry. & Coal Co. v. U. S., supra, 257 U. S., page 63, 42 S. Ct. 32, 66 L. Ed. 124), the right of appellants to have the permit applied for, as I view it, is unquestionable. While the precise point has never been decided, several cases in the Supreme Court throw light upon it, and it is proper to consider these cases.

The first that need be noted is Maryland v. West Virginia, 217 U. S. 577, 30 S. Ct. 630, 54 L. Ed. 888. After the original decision, Id., 217 U. S. 1, 30 S. Ct. 268, 54 L. Ed. 645, counsel for the two states submitted drafts of a decree to be entered in the case, and this brought to the attention of the court for the first time the question whether the boundary line in the Potomac river between the two states should be at high-water or low-water mark on the West Virginia side. In its supplemental opinion, Id., 217 U. S.

577, 30 S. Ct. 630, 631, 54 L. Ed. 888, the Supreme Court quotes the report of the arbitrators (re the Maryland and Virginia line) as follows: "Taking all together, we consider it established that Virginia has a proprietary right on the south shore to low-water mark, and, appurtenant thereto, has a privilege to erect any structures connected with the shore which may be necessary to the full enjoyment of her riparian ownership, and which shall not impede the free navigation or other common use of the river as a public highway."

And with reference to this, Mr. Justice Day, who wrote the opinion, said: "The compact of 1785 * * * is set up in this case, and its binding force is preserved in the draft of decrees submitted by counsel for both states. We agree with the arbitrators in the opinion above expressed, that the privileges therein reserved respectively to the citizens of the two states on the shores of the Potomac are inconsistent with the claim that the Maryland boundary on the south side of the Potomac river shall extend to high-water mark. There is no evidence that Maryland has claimed any right to make grants on that side of the river, and the privileges reserved to the citizens of the respective states in the compact of 1785, and its subsequent ratifications, indicate the intention of each state to maintain riparian rights and privileges to its citizens on their own side of the river."

This language, and particularly the latter portion of the quotation, is entirely consonant with the rights claimed here, for it distinctly recognizes the validity of the claim of each commonwealth on behalf of its landowners to maintain riparian rights on their own side of the river. And there is nothing in the later case of Marine Ry. & Coal Co. v. U. S., supra, which challenges this conclusion *so far as it relates to these private rights.* But in the still later case of Smoot Sand & Gravel Corp. v. Airport, 283 U. S. 348, 51 S. Ct. 474, 475, 75 L. Ed. 1109, which involved alone the question of jurisdiction, the decision in the Maryland v. West Virginia Case is criticized. But in this criticism, and in reaching the conclusion reached in the Smoot Case, the Supreme Court was dealing solely with the question of the boundary between the states and not with the question of private rights, so that whatever disagreement there was to the conclusion reached in the Maryland v. West Virginia Case should be and must be confined to the effect of the former decision on the boundary, and that this is true is made apparent by the further language of the court in the Smoot Case, as follows: "The Compact is seen in a different light in Marine Railway & Coal Co. v. United States. As stated in 257 U. S. 64, 42 S. Ct. 32, 66 L. Ed. 124, Article 7 gave the citizens of each State full property in the shores of the River adjoining their lands and the privilege of carrying out wharves, etc., but left the question of boundary open to long continued disputes. The rights of private citizens established by Article 7 were further cared for by Article 12 giving citizens of each State having lands in the other liberty to transport to their own State the produce of such lands or to remove their effects, free of any charge or tax. But private ownership does not affect State boundaries."

This distinction, that is to say, the difference between the interstate boundary on the one hand and the private rights of property on the respective river banks on the other, is recognized in Oklahoma v. Texas, 260 U. S. 606, 632, 43 S. Ct. 221, 225, 67 L. Ed. 428, where, discussing the Treaty of 1819 between the United States and Spain (8 Stat. 252), in relation to the use of the waters and the navigation of the Red and Arkansas rivers, in which the treaty provision showed the boundary as "on the bank," it is said: "This part of the treaty provision is quite unlike the old compact considered in Maryland v. West Virginia, 217 U. S. 577, 30 S. Ct. 630, 54 L. Ed. 888, which gave to the citizens of Virginia full property in the shore of the Potomac, and so carried the jurisdiction and title to the water's edge," i. e., to low-water mark.

From a careful reading of these cases, it is clear to me that no more was decided in the Marine Railway and Smoot Cases, supra, than that the territorial limits of the District of Columbia embrace the bed of the Potomac river to the Virginia bank, but at the same time, with due regard to the necessary implications from the quoted language of the opinions in those cases and Oklahoma v. Texas, it inevitably follows that the effect of the compact, as between the two commonwealths, was the indefeasible grant of riparian rights by the state of Maryland to the citizens of Virginia owning land binding on the Potomac river, and that this right included the right to wharf out in front of their respective properties so as not to obstruct navigation. This has never been questioned or denied as between Maryland and Virginia, and it was held by the Supreme Court in Maryland v. West Virginia, supra, to apply as between those states. Why a different rule should apply to the District of Columbia is not apparent. When Virginia ceded to the nation

the 10-mile strip for the District, it reserved the rights of its citizens to their private property. Among those rights are the rights which the owners of land along the river front embraced within the District then had under the compact, and the rights thus secured are property rights appurtenant to the upland. The United States, by virtue of the cession, acquired no private rights of property. It therefore took the cession subject to those rights.

This conclusion is based on sound reasoning and finds its support in unquestioned acquiescence from the beginning by the two commonwealths originally involved, and by acquiescence likewise on the part of the United States, for ever since the recession the upland proprietors on the Virginia side, particularly around Alexandria, have exercised, without question or interference on the part of the United States, their rights under the compact as riparian owners to build and maintain wharves and docks in front of their private property. The Potomac river from its mouth to the District of Columbia divides Maryland and Virginia. The distance is more than a hundred miles. From 1632, the date of the charter granted by Charles I to Lord Baltimore, to the time of the arbitration in 1877, there was doubt and some contention as to the precise boundary between the two states, Maryland claiming to the Virginia bank, and Virginia to the Maryland bank, but there was never any dispute during this entire period as to the right of the Maryland upland proprietor to the use of the river in the extension from his upland to the line of navigability in the erection of wharves, and equally no question or contention of the right of the Virginia upland proprietor to do likewise. These rights were recognized by the compact. If they had been so minded at the time, it is apparent the two commonwealths might also have agreed that the middle line of the river should be established as the dividing line between them, but they did not do this and left that question open, and it was because of this that the Supreme Court felt called upon to say in the several cases referred to above that the true dividing line was that made by the charter to Lord Baltimore, unaffected by the subsequent grant to Lord Culpeper, and that no change having been made by agreement between the states affecting this line prior to the cession to the United States, no arbitration between the states after that event would affect it.

But this is not also true of the rights of property in the shores, for at the time of the cession by Virginia and by Maryland of the territory embraced within the District of Columbia the compact of 1785 by its terms had established such private rights, and these rights, whether they be regarded as a seizin of the land covered with water or a right of occupation only, sometimes termed a franchise, the two states solemnly pledged their faith should never be repealed or altered without the consent of the other. Potomac S. B. Co. v. Upper Pot. S. B. Co., 109 U. S. 672, 685, 3 S. Ct. 445, 4 S. Ct. 15, 27 L. Ed. 1070. And even if it be conceded that during the period the property was within the District, the United States might, as successor to the rights and powers of both states, have legislated with relation to these rights, it is not contended or suggested they ever did, or that any of the privileges then appertaining to such private property were ever destroyed, and when the United States receded the territory to Virginia, it went back to Virginia, as was said by the Supreme Court in the Marine Railway Case, supra, *"not changed by the grant of Virginia and the regrant by the United States."* (Italics added.)

In this view, it is perfectly clear that under article 7 of the 1785 compact the landowner of the water front of the Potomac river on the Virginia side was granted all the rights which Maryland could grant to enable him to avail of the privileges of a riparian proprietor; a right recognized as property by both Maryland and Virginia. This right was never withdrawn by act of Congress. It therefore remains undiminished and enforceable to-day equally as though the cession from Virginia had never been made, and what this court said in Evans v. United States, 31 App. D. C. 544, to the effect that the compact, upon the cession, fell of its own weight and upon the recession was not revived, was unnecessary to the decision there, and when attempted to be applied, as it is in the opinion here, to private rights secured under the compact, is wholly wrong and without effect.

In this view we have next to consider whether the Secretary of War acted within his lawful discretion in refusing a permit for the erection of a wharf in front of appellants' property. The application for the permit was made pursuant to section 10 of the Act of March 3, 1899. The act is intended to provide the assent of the government, under certain conditions, to the building of structures in the public waters, so as to preserve the public right of navigation. The granting of the permit is a finding that the

structure to be erected will not interfere with commerce and navigation. The act has no relation in itself to the District of Columbia, except as it applies throughout the entire country. The permit, of course, grants no property right, and ought not to be and is not granted except in a case where the applicant shows title to the upland bordering on a navigable river. But in such a case, it has always heretofore issued as of right if it be found that the proposed structure would not impose a burden on navigation. The power to forbid is derived from the commerce clause of the Constitution, and that clause gives Congress control of the navigable rivers in the interest of commerce and navigation. When that condition is satisfied the power falls.

In this case the title of appellants to land in Virginia bordering the river and opposite the District is undisputed. It is quite true that appellants' land has been extended out beyond its original boundaries, but this change has been from natural and gradual processes, which added imperceptibly to appellants' property on the Virginia bank. This gradual change is known as accretion, and the additional land has thus become an essential attribute of the original property. That this accretion belongs to the owner of the land has always been recognized in the United States. See Arkansas v. Tenn., 246 U. S. 158, 38 S. Ct. 301, 62 L. Ed. 638, L. R. A. 1918D, 258, and Shively v. Bowlby, supra, 152 U. S. page 35, 14 S. Ct. 548, 38 L. Ed. 331. And in Oklahoma v. Texas, 265 U. S. 499, 44 S. Ct. 571, 573, 68 L. Ed. 1118, the court said: "The boundary between the two states is not an unswerving line, but a river bank, and where through the natural and gradual processes of erosion or accretion the bank is changed the boundary follows the change."

The case, therefore, is one in which an upland proprietor on the Virginia bank bordering the Potomac river, whose right to wharf out in front of his property is granted by the compact between Maryland and Virginia, unaffected by any legislation on the part of Congress after the cession by Virginia and Maryland to the United States, and whose proposed wharf has been found by the Secretary of War not to be an obstruction to navigation, is nevertheless denied the permit authorized under section 10 of the Rivers and Harbors Act of 1899; and it is insisted on behalf of the Secretary that because of an act of Congress for the development and completion of the George Washington Memorial Parkway, and because in the carrying

out of that project it is intended to construct a parkway along the shore of the river on the Virginia side and in front of appellants' property, he is entitled thus to exercise a discretion, having no relation to commerce and navigation, in the granting and withholding of the permit. But the permit applied for, as we have already seen, has relation alone, under the statute, to the question whether the proposed structure will interfere with the navigable capacity of the river. This question being decided in favor of the applicant, and his ownership of the adjacent upland being conceded, it must follow that the refusal of the Secretary cannot be sustained on the ground on which it is sought to place it. He says in his letter denying the permit: "After having gone into the matter fully with yourself and your representative and with Colonel Ulysses Grant, III, the chairman of the National Capital Park and Planning Commission, I have concluded that the development contemplated by you interferes with a public policy." The public policy to which the Secretary refers is the policy announced by Congress in the act relating to the George Washington Highway. But this has no relation to his duty under the Rivers and Harbors Act. The discretion there conferred on him is to ascertain whether the granting of a permit will obstruct navigation. When it is shown that it will not, the discretion which the act confers is exhausted, and he may not have resort to another ground as the basis of a refusal to issue the permit. Kansas v. Colorado, 206 U. S. 46, 27 S. Ct. 655, 51 L. Ed. 956; People ex rel. Sprenger v. Department of Health of City of New York, 226 N. Y. 209, 123 N. E. 379.

While the act of Congress to which we have referred contemplates the building, under the direction of a planning commission, of a memorial parkway which shall extend from Mount Vernon to the Great Falls on the Virginia side of the river, we must also take notice of the fact that the act provides that the project shall depend upon the appropriation of certain money and the dedication of certain lands or money by the states of Maryland and Virginia, or the political subdivisions thereof, or by private interests, and we are not informed that such action has been taken by either commonwealth, or by any subdivision thereof, or that private persons have advanced the funds or dedicated the lands necessary to the project. In the meantime, the owner of a water lot bordering the river, entitled to enjoy the advantages thus conferred upon his land by its adjacency to the river, which includes

the right to access to the navigable part thereof, and which right, whether it be a property right or an easement, cannot be questioned, and whose proposed structure it has been determined will not interfere with the navigation of the river, applies for, and I think is entitled to receive, a permit for the construction of his wharf. In such circumstances, we cannot say that, because at some future time the land or the waters in front of it may be needed for a work of public improvement, his own rights are lost or must be held in abeyance. To hold otherwise is to condone the spoliation of private right by public authority and to approve the exercise of an arbitrary discretion which, if conceded may now and in the future be both oppressive and dangerous. Appellants' property is useful only for wharf purposes; but that use gives it value. Without the permit the value is lost, and unless redress can be afforded here, it can be found nowhere else. The case is peculiarly one in which the writ should issue.

Nothing I have said may be construed as suggesting the United States have not the right to take the property. If Congress has authorized its taking for parkway purposes, as to which the record is silent, it may be taken by condemnation in a proper proceeding for that purpose. The United States may perhaps have other rights with which we are not now concerned. But to say that, because at some future time the land or the water in front of it may be needed for a work of public improvement, appellants' property rights are lost or must be held in abeyance, is wholly without merit.

The decision of the lower court should be reversed, and the writ awarded.

I am authorized by Judge HITZ to say he concurs in this dissent.